**UNITED STATES of America, ex rel. Janaki RAMADOSS, et al., Plaintiffs,**

v.

**CAREMARK INC., et al., Defendants.**

No. SA–99–CA–00914–WRF.

United States District Court,
W.D. Texas,
San Antonio Division.

Aug. 27, 2008.

Allie Pang, Andrea Jo Larry, Meredith Lynn Burrell, U.S. Department of Justice, Civil Division, Washington, DC, Winstanley F. Luke, Assistant U.S. Attorney, Robert Shaw–Meadow, U.S. Attorney's Office,

Marlene M. Martin, Law Office of Marlene M. Martin, San Antonio, TX, Valerie L. Kelly, Office of the Attorney General, Little Rock, AR, Lorinda Holloway, Brown, McCarroll, Bill Ralph Moss, Paul B. Moore, Office of the Attorney General, Antitrust & Civil Medicaid Fraud Division, Linda A. Halpern, Assistant Attorney General, Richard E. Salisbury, Office of the Texas Attorney General, Gaye Lynn Rothman, Kurt H. Kuhn, Thomas H. Watkins, Walter H. Mizell, Brown, McCarroll & Oaks Hartline, L.L.P. Austin, TX, Siobhan Franklin, Bureau of Medi–Cal Fraud and Elder Abuse, California Department of Justice, San Diego, CA, Robert A. Barba, Office of the Attorney General, Chicago, IL, Fred Duhy, Director, Medicaid Fraud Control Unit, James R. Murray, Office of Attorney General of Louisiana, Medicaid Fraud Control Unit, Baton Rouge, LA, Peter M. Coughlan, Office of the Attorney General, Antitrust Division, Nashville, TN, for Plaintiffs.

Charles J. Muller, III, Farley P. Katz, Merritt M. Clements, Strasburger & Price, L.L.P., San Antonio, TX, Charles A. Trost, Jennifer L. Weaver, Manisha S. Desai, Waller Lansden Dortch & Davis, LLP, Nashville, TN, Howard M. Pearl, Winston & Strawn, LLP, Chicago, IL, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART CAREMARK'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ROYAL FURGESON, District Judge.

I. Introduction ............................................................. 672

II. Summary .................................................................. 672

III. Background .............................................................673
 A. Medicaid ..........................................................673
 B. Third Party Liability ...........................................675
 C. The Role of Caremark ..........................................676
 D. Caremark v. Goetz .............................................678
 E. Restrictions and Assignment...................................681
 F. Brief Procedural History .......................................682

IV. Standard of Review .....................................................683

V. Applicability of False Claims Act .....................................684
 A. Presentment....................................................684
 B. The False Claims Act ...........................................685
 1) Falsity ......................................................685
 i. A True Statement is not False under the False Claims Act.........687
 ii. A Claim Cannot Be False When the Law is Unclear and There
 is a Legitimate Good Faith Disagreement About the
 Applicable Governing Law ...................................688
 iii. The FCA is a Punitive Statute ...............................690
 iv. The FCA is Not a Catchall Provision...........................691
 2) Obligation ...................................................692
 i. Collateral Estoppel .......................................693
 ii. Analysis of the "Obligation" Element Under the Sixth, Eighth,
 and Tenth Circuits .......................................694
 iii. Analysis of the "Obligation" Element in the Fifth Circuit ..........697

VI. Statute of Limitations ..................................................699
 A. Controlling Date for Statute of Limitations Purposes .....................699
 B. The Core Requirement of Notice .......................................700
 C. Relation Back Under Federal Rule of Civil Procedure 15(c)(1)..............701
 D. Relation Back Under Federal Rule of Civil Procedure 15(c)(2)..............703
 E. Purpose of the FCA and its Limitations ...............................705
 F. Tolling of the Statute of Limitations ..................................705

VII. Recoupment ...........................................................706

VIII. Caremark's Examples of Allegedly False Claims ..........................708
 A. IHS Example: Timely Filing Restriction ...............................708
 B. Oklahoma Medicaid Example: Out-of-Network Restriction ................710

IX. The Government's Examples of Allegedly False Claims .......................712
 A. The Government's Paper Claims Examples .............................712
 1) February 24, 2005 Rejection Letter to Texas Medicaid .................713
 2) November 4, 2004 Rejection Letter to Illinois Medicaid .................713
 3) October 11, 2006 Rejection Letter to New Jersey Medicaid..............714
 4) November 10, 2006 Rejection Letter to Indiana Medicaid ..............714
 5) Letter to the VA .........................................714
 B. The Government's Reauthorization Example ...........................715
 C. The Government's Timely Filing Examples ............................715
 1) March 19, 2005 statement to Illinois Medicaid .........................715
 2) November 16, 2004 statement to Delaware Medicaid ...................716
 D. The Government's Out-of-Network Examples ..........................716
 1) January 1, 2007 statement to Massachusetts Medicaid .................716
 2) August 19, 2006 statement to Florida Medicaid .......................716
 3) Out-of-Network statements for the VA and IHS ......................717

X. Conclusion .............................................................717

## I. Introduction

This case is a *qui tam* action against Defendant Caremark Inc. ("Caremark") alleging violations of the reverse false claims provision of the False Claims Act (the "FCA"), 31 U.S.C. § 3729 *et seq.* Pursuant to the FCA, a private citizen may commence an action by filing under seal a complaint in the government's name to allege fraud on the Government. *Id.,* § 3730(b). If the government elects to intervene and obtains a judgment, the private citizen, referred to as a "relator," gets a percentage. *Id.,* § 3730(d)(1).

The relator ("Relator") filed the instant case under seal on August 25, 1999. After seeking numerous extensions, the United States (the "Government") elected to intervene six years later and the complaint was finally unsealed. This is a multi-state litigation action that involves the Government, Relator, and several other states that are either parties to the litigation or represented by Relator or the Government. This case is complicated and involves many complex issues. The briefing has been voluminous, but of the highest level. Discovery in this matter has been shepherded by the exceptional and conscientious work of a Special Master. Central to the case are the plaintiffs' allegations that Caremark violated the reverse false claims provision of the FCA by applying restrictions contained in the health plans it administers.

At this state of the litigation, the Court is trying to resolve several preliminary motions and dispose of specific issues brought before the Court through various motions for summary judgment. Before the Court are Caremark's Motion for Partial Summary Judgment Against the Government (Docket No. 318); the Government's Response (Docket No. 395); Caremark's Reply (Docket No. 423); the Government's Motion for Partial Summary Judgment Against Caremark (Docket No. 344); Caremark's Response (Docket No. 388); and the Government's Reply (Docket No. 471). The parties appeared before the Court at a hearing on January 28–29, 2008. After careful consideration of the parties' briefing and arguments at the hearing, the relevant law, and applicable facts, the Court is of the opinion Caremark's Motion for Partial Summary Judgment (Docket No. 318) should be GRANTED IN PART AND DENIED IN PART and the Government's Motion for Partial Summary Judgment (Docket No. 471) should be DENIED.

## II. Summary

Caremark moves for summary judgment on four issues: (1) the Government's FCA claims on behalf of state Medicaid agencies fail because Caremark's statements rejecting or denying Medicaid claims were submitted to state Medicaid agencies, not the Government; (2) all of the Government's FCA claims arising six years prior to its unsealed complaint-in-intervention are barred by the statute of limitations in the False Claims Act; (3) the Government's recoupment claims fail because the Government did not pay any money to Caremark in connection with Medicaid reimbursement requests and therefore there is nothing to recoup from Caremark; and (4) two examples of allegedly reverse false claims by the Government are not legally operative: a timely filing denial of a request for reimbursement from Indian Health Services, and an out-of network denial sent to Oklahoma Medicaid. For the reasons stated below, the Court grants in part and denies in part Caremark's Motion.

The Government moves for summary judgment on the following issues: (1) Caremark owes the Government an "obligation" under the FCA and Caremark is collaterally estopped from arguing that plan restrictions defeat obligation; (2) as a matter of law, the statements Caremark

made to avoid reimbursing the Government were "false" under the FCA; (3) the Government is entitled to recoup the federal share of Medicaid overpayments and the overpayments made by the VA and IHS, and (4) Caremark's "no paper claims," timely filing, out-of-network, and preauthorization denials are false. In response, Caremark cross-moves for summary judgment, asserting that there is no evidence to establish the "falsity" and "obligation" elements of a reverse FCA violation. Caremark also cross-moves for summary judgment on the Government's specific examples of alleged false claims.

For the reasons below, the Court makes the following rulings: (1) the Court denies summary judgment for Caremark on the issue of whether the alleged false claims at issue in this litigation must be presented to the Government; (2) the Court grants summary judgment in favor of Caremark and denies summary judgment for the Government with respect to the "falsity" element of reverse FCA claims based on Caremark applying restrictions that existed in the corresponding plan on pre-*Goetz* denials; (3) the Court grants summary judgment in favor of Caremark and denies summary judgment for the Government with regard to the "obligation" element of the FCA for Caremark's denials of reimbursement requests made to state Medicaid agencies; (4) the Court grants summary judgment in favor of Caremark that the FCA's statute of limitations provision prohibits the Government's FCA claims prior to August 19, 1999; (5) the Court grants summary judgment in favor of Caremark and denies summary judgment for the Government on the issue of common law recoupment; (6) the Court both grants and denies summary judgment for Caremark, and denies summary judgment for the Government, with respect to the examples of alleged false claims listed below; and (7) the Court grants summary judgment in favor of Caremark and denies summary judgment for the Government with regard to alleged false claims that are based on out-of-network or preauthorization restrictions, as the Court finds that such restrictions are substantive.

## III. Background

### A. Medicaid

The Medicaid program was established in 1965 and is codified as Title XIX of the Social Security Act. *See* 42 U.S.C. § 1396, *et seq.* Medicaid is "a needs-based entitlement program providing joint federal and state funding of medical care for specified classes of individuals found to be unable to pay their own medical costs." *In re Zyprexa Prods. Liab. Litig.*, 451 F.Supp.2d 458, 467 (E.D.N.Y.2006); 42 U.S.C. § 1396d. It is administered by the states but financed with both state and federal funds. The federal government provides 50% to 83% of the costs of care and services. *Id.* The exact percentage for a particular state—known as the federal medical assistance percentage—is calculated pursuant to a formula tied to the state's per capita income. *See* 42 U.S.C. § 1396d(b); 42 C.F.R. § 433.10.

The states are not required to participate in Medicaid but all do. *Ark. Dep't of Human Servs. v. Ahlborn*, 547 U.S. 268, 275, 126 S.Ct. 1752, 164 L.Ed.2d 459 (2006). There are many statutory requirements for the states to participate in Medicaid. *Zyprexa*, 451 F.Supp.2d at 467. For example, some Medicaid beneficiaries also have coverage through other health plans, also referred to herein as "third parties," or "third party coverage providers."[1] States are required to take all

---

1. Those other health plans are administered through entities like Caremark called pharmacy benefit management companies. *Care-* *mark, Inc. v. Goetz*, 395 F.Supp.2d 683, 685 (M.D.Tenn.2005).

reasonable measures to determine the legal liability of third parties to pay for care and services available under the state's Medicaid plan. *Id.*; 42 U.S.C. § 1396a(a)(25)(A).

Individuals who have coverage under both Medicaid and an additional health plan under a third party are referred to as "dual eligibles."[2] *Id.* at 686. If the state Medicaid agency provides medical services to a beneficiary and it is later discovered that the beneficiary is a dual eligible, and thus there is third party liability, the state Medicaid agency is required to seek reimbursement if the amount of reimbursement exceeds the costs of recovery. 42 U.S.C. § 1396a(a)(25)(B). State Medicaid agencies can seek reimbursement to the extent a third party is legally liable. *Caremark v. Goetz*, 480 F.3d 779, 789 (6th Cir.2007) (citing 42 U.S.C. § 1396a(a)(25)(A)-(B)). This is because Medicaid is considered to be the payor of last resort, meaning that Medicaid coverage is secondary to other coverage a Medicaid beneficiary may have. *Goetz*, 395 F.Supp.2d at 686. In other words, when a dual eligible requests medical care or services that are covered in the applicable health plan, the third party coverage provider must pay for such care and services to the extent legally liable before Medicaid pays. However, in situations where a particular service is not covered by the third party health plan, Medicaid is the only payor. When a Medicaid beneficiary does not have third party coverage, Medicaid is in fact the only payor, and by default, the payor of last resort.

States must also require Medicaid recipients to assign the state Medicaid agency their rights to obtain payment for medical care from a third party. *Id;* § 1396k(a)(1)(A); *Zyprexa,* 451 F.Supp.2d at 467; *see also* 42 C.F.R. §§ 433.137–154.

The state is tasked with recovering third party liability; it is the state, not the federal government, that is assigned the beneficiary's rights.

State Medicaid agencies receive federal funding in the form of federal financial participation ("FFP") for the relevant Medicaid expenditures. 42 C.F.R. § 433.140(a)(2). The federal government will not provide FFP to a state Medicaid agency if the Medicaid agency receives reimbursement for care and services from a liable third party, such as a third party coverage provider. *Zyprexa,* 451 F.Supp.2d at 468. Likewise, the federal government will not provide FFP if the state could have received reimbursement from a third party but failed to comply with federal regulations requiring it to pursue reimbursement from that third party. *Id;* *see also* 42 C.F.R. §§ 433.138–139, 140(a)(1).

Similarly, if a state Medicaid agency has already received FFP from the federal government and later receives third party reimbursement for those expenditures, the state Medicaid agency "must pay the federal government 'a portion of the reimbursement determined in accordance with the [federal medical assistance percentage] for the [s]tate.'" *Zyprexa,* 451 F.Supp.2d at 468 (quoting 42 C.F.R. § 433.140(c)); *see also* 42 U.S.C. § 1396k(b). However, if a state receives less than full reimbursement for its Medicaid expenditures, despite having pursued third-party reimbursement in compliance with federal requirements, "the federal share of the recovery is reduced pro rata. The same protection accrues to the state if it voluntarily reduces or waives its recovery because it determines that it is not cost-effective to attempt to recover the full

---

**2.** Dual eligible in this Order does not refer to an individual who has both Medicaid and Medicare coverage, as it is often used.

amount of its Medicaid expenditures." *Zyprexa*, 451 F.Supp.2d at 468; 42 U.S.C. § 1396a(a)(25)(B); 42 C.F.R. § 433.139(f).

However, other than cost-effectiveness, states are not permitted to compromise the federal government's share of any reimbursement. *Zyprexa*, 451 F.Supp.2d at 468 (citing *Ahlborn*, 547 U.S. at 289, 126 S.Ct. 1752 (stating that a state may allow Medicaid recipients to retain the state's share of recovery in tort actions against third-party tortfeasors as long as the state does not compromise the federal government's share)). Consequently, if a state voluntarily reduces or waives its recovery for reasons other than cost-effectiveness, it will forfeit FFP in the relevant Medicaid expenditure. Likewise, if a state that has already received FFP voluntarily reduces or waives its claim to recovery for a reason other than cost effectiveness, the state must reimburse the federal government. *Zyprexa*, 451 F.Supp.2d at 468; *see, e.g., In re Wash. State Dep't of Soc. & Health Servs.*, No. A–95–159, 1996 WL 157123 (H.H.S.Dep't.App.Bd. Feb. 7, 1996).

Similar to state Medicaid agencies, the Department of Veterans Affairs ("VA") and Indian Health Services ("IHS") also pay for prescription drug benefits for individuals and dual eligibles and are authorized by statute to recover the reasonable cost of medical care and services from liable third parties.[3] With regard to the VA, the statute provides that the Government is subrogated to any right or claim that a beneficiary might have against a third party. 38 U.S.C. § 1729(b). With IHS, the statute provides that the Government, as well as IHS, have a right to recover against a liable third party. 25 U.S.C. § 1621e(a).

## B. Third Party Liability

Third party liability can occur when a dual eligible seeks medical services that are covered by state Medicaid.[4] For example, certain pharmaceutical costs are often covered by third party coverage providers. *Goetz*, 395 F.Supp.2d at 686. When a dual eligible goes to a retail pharmacy to get a prescription filled, the individual may present his or her Medicaid card at the counter, even if he or she has additional coverage. The individual may not know of his or her additional private coverage or may choose Medicaid because it requires a lower co-pay.[5] *Id.* The pharmacy then accepts the card and sends a claim to the state Medicaid agency for payment. *Id.*

Depending on which system is utilized by the state, a state Medicaid agency has one of two ways to proceed once it receives a claim for payment from a pharmacy. The first way is called "cost-avoidance." *Id.* at 687. When a state Medicaid agency

---

**3.** Dual eligible in this situation refers to individuals who are eligible for VA or IHS benefits as well as third party coverage.

**4.** Throughout this Order, the Court refers to state Medicaid agencies, or generally uses the terms "Medicaid" or "state Medicaid" to denote the same. The Court also observes that although the IHS and VA statutes differ somewhat from the Medicaid statutes, the Court's analysis regarding state Medicaid agencies also applies to IHS and the VA, unless otherwise noted, even though the Court often refrains from referring to these entities by name throughout this Order.

**5.** There are multiple reasons a dual eligible may not present his or her card. Additionally, many states do not require a co-pay at all when paying under Medicaid, compared to a possible co-pay if the claim is processed through existing independent coverage. In this situation, the dual eligible, whose economic situation makes him or her eligible for Medicaid, may make the calculated decision to declare only Medicaid coverage in order to bypass an out-of-pocket expense.

receives a claim for payment and establishes the "probable existence" of third party liability at the time a claim for medical services is filed, the agency must reject the claim and return it to the provider for a determination of the amount of liability. *Id.*; 42 C.F.R. § 433.139(b)(1). "This is called 'cost-avoidance' because it 'avoids' the cost to Medicaid by preventing a claim from being paid by Medicaid in the first place." *Goetz*, 395 F.Supp.2d at 687. Under this approach, a state Medicaid agency receives a claim, denies it, and returns it to the third party coverage provider. If the state Medicaid agency cannot establish the probable existence of third party liability, or if third party benefits are not available to pay the individual's medical expenses when the claim is filed, the state Medicaid agency must pay the full amount allowed under the agency's payment schedule. *Id.*; 42 C.F.R. § 433.139(c).

The second way a state Medicaid agency addresses a claim for payment is called "pay and chase." *Goetz*, 395 F.Supp.2d at 687. Under this approach, the state Medicaid agency is unaware of whether the beneficiary has additional third party coverage. When a dual eligible does not notify the pharmacy of additional coverage, and state Medicaid is unaware of the additional coverage, under "pay and chase," state Medicaid is required by law to pay the claim and recover reimbursement afterward to the extent of the third party's "legal liability." *Id.*; 42 U.S.C. § 1396a(a)(25); 42 C.F.R. § 433.139(d)(2). If the state Medicaid agency later discovers the existence of third party coverage, or benefits become available from a third party after Medicaid pays the claim, it

must seek recovery of reimbursement. *Goetz*, 395 F.Supp.2d at 687; 42 C.F.R. § 433.139(d)(2). "Pay and chase" can only occur after state Medicaid has paid the claim; it cannot occur at the point of sale. *Goetz*, 395 F.Supp.2d at 687. Each state can either "pay and chase" or use "cost avoidance." [6] If a state employs a "cost avoidance" method, it appears that the issues relevant to this litigation are not implicated. Under "cost avoidance," third party liability is extinguished *before* state Medicaid disperses a payment. After a third party pays its liable portion under a health plan, state Medicaid pays the rest—and is by default the payor of last resort.

### C. The Role of Caremark

Caremark is a pharmacy benefit management ("PBM") company that administers health care plans for its clients, which include insurance companies, managed care organizations, and public and private health plans and organizations. *Goetz*, 395 F.Supp.2d at 685. In addition, it has contracted with both retail pharmacy chains and independent retail pharmacies to form a network of more than 57,000 retail pharmacies. *Id.* at 687. "Caremark's services are generally referred to as pharmacy benefit management services." *Id.* at 685.

Caremark contracts with third party coverage providers (also referred to herein as "Caremark's clients") through PBM Agreements whereby Caremark agrees to administer the client's plan. *Id.* Caremark is not the health insurance provider or the sponsor of the health care plan.[7] Instead, Caremark processes claims and distributes prescription drugs in accordance with the

---

**6.** This analysis also appears to apply to IHS and the VA.

**7.** To the extent Caremark is referred to as a health care insurer or sponsor in previous cases, this Court observes that Caremark does not fall into either of these categories. Fur-

thermore, the parties to this litigation stipulate that Caremark administers health care plans according to the terms of the plans created by Caremark's clients. *Caremark's Mot. for Partial Summ. J. at 1; App. to Govt's Mot. for Partial Summ. J.* at 4.

plans that are designed by its clients. *Id.* at 687. Caremark's role is to administer its clients' plans in accordance with the provisions in plans. Caremark processes claims on behalf of its clients, not using Caremark's funds, but using the client's funds. Thus, Caremark is only permitted to draw on its client's funds to pay reimbursements under the conditions laid out in the plan.[8] When administering its clients' plans, Caremark is paid by the client when it processes a reimbursement request for the client. Caremark is not paid unless a payment is permitted under the plan. The individual person that receives the benefits of such plans, often an employee of Caremark's client, is referred to in this Order as the "plan participant."

Caremark's clients create plans and agree to pay for certain coverage (for example, a particular prescription, or the ability to fill a prescription at a particular pharmacy). The clients (sometimes health plans or companies) fund the plans. As coverage is added, it conceivably costs more for the client. The elements of a particular client's plan are often referred to as "restrictions" or "benefit plan limitations." *Goetz*, 395 F.Supp.2d at 688. Thus, plans often include "restrictions" that restrict the plan participant from doing something, such as restricting plan participants from filling prescriptions at certain pharmacies. The elements of a plan are also referred to as "benefits." For example, a plan might include the "benefit" of allowing a plan participant to obtain a prescription and then submit a

payment after-the-fact, instead of having to pay at the point of sale.

Plans contain a variety of restrictions/benefits, and clients often have more than one plan. Examples include the option for a plan participant to pay for a prescription directly at the pharmacy counter, and then seek reimbursement from his or her health plan provider at a later date, as mentioned above. Some plans prohibit such after-the-fact reimbursement options. Other restrictions include a requirement for preauthorization from a doctor before a plan participant can receive a certain type of prescription, or a restriction that the plan participant must use only certain "in network" pharmacies to obtain prescriptions. Under a client's plan, if a plan participant uses a pharmacy that is not in the network, he or she may receive no coverage or reduced coverage.[9]

The primary issue in this litigation is whether Caremark can apply existing restrictions to reject a reimbursement request from a state Medicaid agency, the VA or IHS, and whether Caremark's application of the restriction in accordance with a health plan constitutes a reverse false claim under the False Claims Act (the "FCA"). Caremark raised the issue of whether certain restrictions can be applied to Medicaid in a case recently decided by the Sixth Circuit, *Caremark v. Goetz*, 480 F.3d 779. The *Goetz* case did not address the FCA or whether applying restrictions triggered punitive damages; instead it addressed whether specific restrictions could be applied to Medicaid.

---

**8.** *See Caremark's Resp.*, Ex. 3. The Centers for Medicare & Medicaid Services ("CMS") issued a fact sheet stating that health plans should allow PBMs to pay reimbursements in certain situations. CMS is a federal agency that administers Medicare and Medicaid. In theory, when a client becomes insolvent and Caremark as an administrator receives a reimbursement request, Caremark is unable to process the claim because there are no funds

to draw upon. Additionally, if the contractual relationship between the client and Caremark is terminated and Caremark receives a reimbursement request, Caremark is unable to process the claim because there is no contract permitting Caremark to process the request.

**9.** In creating a plan, the client can decide whether to expand or constrict the pharmacies permitted as "in network."

### D. *Caremark v. Goetz*

After the instant case was initiated in 1999, Caremark filed a declaratory judgment action in the District Court of Tennessee in 2004, seeking clarification of existing law and judgment as to whether certain restrictions were enforceable with respect to third-party claims asserted by Tennessee Medicaid for reimbursement. *Goetz*, 395 F.Supp.2d at 684. The United States filed a motion to intervene and sought dismissal of the case, or transfer to the Western District of Texas where this current FCA case was pending. *Id.* at 685. The court granted the motion to intervene, but denied the motion to transfer. *Id.* Before the court in *Goetz* were three benefit plan limitations: (1) the requirement that the eligible plan participant be identified at the point of sale (known as the "card presentation" requirement, or "paper claims" restrictions); (2) "timely filing" limitations; and (3) "out-of-network" limitations. *Id.* at 688.

The card presentation restriction requires the eligible plan participant to be identified at the point of sale when a prescription is filled at a pharmacy. *Id.* Usu-ally, this is done by presenting a Caremark card at the point of sale or providing the pharmacy with information that the individual is a plan participant in a Caremark-administered plan. *Id.* Plans with this restriction may decline to provide coverage if an individual fails to identify herself as a plan participant at the point of sale. *Id.* However, some plans allow plan participants to obtain services and prescriptions without identifying themselves as participants in Caremark-administered plans at the point of sale. *Id.* This plan design feature is sometimes referred to as a "paper claims benefit" because the plan participant submits a claim form and/or receipt to Caremark after the participant receives the requested prescription.[10] *Id.* In this situation, a plan participant obtains prescriptions without identifying herself, pays out of pocket at the retail pharmacy, and then seeks reimbursement (after-the-fact) from the third party coverage provider at a later date.[11] *Id.*

The timely filing restriction involves a maximum number of days that a plan participant has to submit a claim for reimbursement from the date a prescription is filled by a pharmacy. *Id.* at 688–689. The out-of-network restriction involves a net-

---

**10.** Card presentation and paper claims restrictions are often used interchangeably throughout this Order.

**11.** Central to Caremark's business structure is the fact that Caremark's computer system (Caremark's adjudication engine), which processes claims, is accessible through certain pharmacies. In certain pharmacies, when a pharmacist inputs into the computer a plan participant's prescription request, the request communicates with Caremark's computer, is analyzed under the terms of the participant's plan, and electronically submits the request to Caremark for processing. Some clients want to allow their plan participants to pay in cash at the point of sale and then submit a paper claim for reimbursement through the mail at a later point. When a reimbursement is processed not through the pharmacy's computer at the counter, but sent to Caremark after-the-fact, Caremark must manually input the request. Sometimes clients decide they do not want their plan participants to submit paper claims for reimbursement. In many cases paper claims for reimbursement are either not allowed or the reimbursement amount to the plan participant is decreased.

The difference is not so much an "electronic" versus "paper" distinction as it is whether the claim is processed via the pharmacy's computer or submitted after-the-fact and therefore not from the pharmacy's computer. Significant to this Order, if a plan participant or other party seeking reimbursement submits a request-after-the-fact, but electronically instead of via paper, the request is still considered an after-the-fact request, which is commonly referred to as a paper claim.

work of pharmacies contained in the third party health plan that is administered by Caremark. *Id.* at 689. The network includes Caremark's network of pharmacies or a subset thereof. *Id.* Caremark-administered plans with an out-of-network restriction sometimes deny or lower reimbursements, or require a higher co-pay, when plan participants fill prescriptions at pharmacies outside of the network.[12]

The way Medicaid fits into this scenario is that the restrictions in the plan often determine whether the third party coverage provider will pay for the medical care or prescriptions requested by the plan participant. This can occur, for example, when a dual eligible attempts to have a retail pharmacy fill her prescription, but upon arriving at the counter, she does not present her Caremark card. Because she is also covered by Medicaid, the pharmacy fills her prescription and then submits the claim to Medicaid. After discovering that the individual is dual eligible and thus has coverage through a third party, Medicaid submits a request for reimbursement to that third party. In this instance, the third party might reject Medicaid's request for reimbursement because a provision of the health care plan requires that the individual present her Caremark card at the point of sale at the pharmacy in order to receive coverage. With regard to this specific type of restriction, the court in *Goetz* determined that it was an impermissible restriction against Medicaid because it discriminated against Medicaid. However, instead of issuing a blanket statement that all restrictions presumptively discriminate against Medicaid, the court thoughtfully laid out a context under which to analyze this issue.

The district court developed a framework to determine whether plan limita-

tions are impermissible against Medicaid. On the outset, the court determined that under the Tennessee Medicaid statute, a Medicaid beneficiary is deemed to have assigned his or her rights to payment to the Tennessee Medicaid agency ("TennCare") at the time he or she requests goods or services, or the point of sale. *Goetz*, 395 F.Supp.2d at 694. Thus, TennCare did not receive "any greater rights than the beneficiary under the policy." *Id.* Whether the assignment of rights occurs at the point of sale or when a beneficiary enrolls in Medicaid, Medicaid is only assigned the rights the plan participant has under the terms of the plan.

The court further made a distinction between procedural restrictions and substantive restrictions. *Id.* The court determined that substantive restrictions contained under the plan would apply to the state Medicaid agency while procedural restrictions that are discriminatory would not. *Id.* The court explained that "[t]his construction simply prevents insurance plans from erecting 'procedural' roadblocks to reimbursement that are inconsistent with the anti-discrimination policies set forth in the statutes governing Medicaid." *Id.* The court concluded that card presentation or paper claims restrictions, as well as timely filing restrictions were procedural and could not be applied to reject TennCare's request for reimbursement. *Id.* at 696.

The Sixth Circuit affirmed the district court's decision and expanded on the substantive/procedural distinction. *Goetz*, 480 F.3d at 788. The Sixth Circuit explained that procedural limitations "deal only with the manner or mode of requesting coverage." *Id.* On the other hand, the Court determined that substantive restrictions

---

**12.** There are several other types of plan limitations but the only ones raised and addressed in *Goetz* were these three.

deal with the "type or quantum of benefits available to a beneficiary under the plan." *Id.* The Sixth Circuit further explained that the procedural versus substantive guidepost is merely a threshold determination; the ultimate question is whether a procedural restriction is inconsistent with Medicaid's anti-discrimination policy. *Id.* Therefore, it appears that under the analysis in *Goetz,* at the point of sale, health plan restrictions apply to Medicaid unless: (1) a restriction is procedural in nature; *and* (2) its application to Medicaid has the effect of discriminating against Medicaid.[13]

Furthermore, the Sixth Circuit affirmed the district court's determination that card presentation and timely filing restrictions are impermissible restrictions because they "inappropriately shift Caremark's responsibility to pay pharmacy benefits on behalf of a plan participant onto the government." *Id.* at 789. Because such procedural restrictions impermissibly discrim-

inate against Medicaid, the court found they were invalid as applied.[14] *Id.*

This Court observes, however, that Congress enacted the Deficit Reduction Act ("DRA") in 2006, which specifically exempts Medicaid from denial of claims based on the date of submission of the claim, the type or format of the claim, or the failure to present proper identification at the point of sale, if the claim is submitted by the state *within the three-year period beginning on the date that the item or service was furnished.* See 42 U.S.C. § 1396a(a)(25)(I) (emphasis added). Therefore, although the Sixth Circuit determined timely filing restrictions are invalid as applied against state Medicaid agencies, Congress's action in the DRA restricts the application of timely filing restrictions against Medicaid if such restrictions provide a time period of three years or less. *Id.; Goetz,* 480 F.3d at 785.[15]

---

13. In the instant case, the Government argues that under *Goetz,* the final inquiry is whether or not a restriction is procedural. The Government does not recognize the second part of the analysis in *Goetz*—whether or not the restriction, if procedural, discriminates against Medicaid. The Court disagrees with the Government's argument that all procedural restrictions are impermissible. Instead, the Court is guided by the analysis expressly laid out by the Sixth Circuit to determine whether a restriction is unlawful, which is to first determine if a restriction is procedural or substantive, and if a restriction is deemed procedural, to then reach the "ultimate question" of whether it discriminates against Medicaid. *Goetz,* 480 F.3d at 788.

14. While the out-of-network restriction was initially raised by Caremark before the district court, it was not before the Sixth Circuit on appeal. With regard to this restriction, the district court observed that Tennessee indicated in its brief that it agreed that TennCare's reimbursement was limited to "the amount due had the drug been obtained from an out-of-network pharmacy." *Goetz,* 395 F.Supp.2d at 693. Thus, Medicaid would get the coverage applicable to the plan partici-

pant at the point of sale. "In other words, reimbursement for a prescription filled by a participant whose plan provide[d] for no coverage or limited coverage for prescriptions filled at an out-of-network pharmacy would be limited to that plan's coverage." *Id.*

Furthermore, the United States adopted the same position. *Id.* However, while before the Sixth Circuit, the Government stated that it had not yet "taken a clear position" on whether out-of-network restrictions could be applied against Medicaid. Nevertheless, although the parties appeared to agree on this issue, the district court decided it was unnecessary to opine on it. The district court noted that under the same analysis that it used for card presentation and timely filing, it would reach the same conclusion as the parties—that is, that out of network restrictions are permissible and apply to Medicaid. *Id.* at 693, n. 4. For the purposes of the current litigation, the Government now argues that out-of-network restrictions are impermissible.

15. Therefore, the Court observes that Congressional acts have limited the *Goetz* decision. *Goetz* can be read to hold that timely filing restrictions can never apply to Medicaid

## E. Restrictions and Assignment

As mentioned above, the parties dispute whether the elements of third party coverage providers' plans can be applied to state Medicaid. Caremark contends that following simple assignment law, it processed each state Medicaid, VA, or IHS request for reimbursement according to the parameters of each plan. Caremark states that it was never informed by a statute or administrative directive that it should do otherwise. As an administrator, when Caremark received a request, it looked at a plan and applied the corresponding restrictions. For example, if a plan covered prescriptions filled at "Generic Pharmacy" and Caremark received a request for payment for a prescription filled at "Generic Pharmacy," Caremark would be authorized to reimburse the request on behalf of the client. Conversely, if a plan did not cover prescriptions filled at "Generic Pharmacy," Caremark was not authorized to draw on the client's account and reimburse the request. Thus, when state Medicaid is assigned rights of a plan participant, it is provided those very same rights.[16] Accordingly, the assignee's right to reimbursement is entirely derivative of the individual plan participant's right.

Consequently, Caremark argues that FCA liability does not apply when it treats state Medicaid requests for reimbursement in the same manner as a plan participant's claims for reimbursement. This is because state Medicaid acquires the plan participant's right to reimbursement. For example, if the plan participant does not have a right to be reimbursed for prescriptions filled without preauthorization, it follows that neither does state Medicaid. Medicaid's mere presence does not mean it is entitled to substantive provisions not included in a client's plan.

Alternatively, under the Government's analysis, no plan restrictions could ever apply to Medicaid requests for reimbursement. Under this theory, Caremark would be forbidden by law from looking at its clients' plans (which the client and plan participant enter into) in order to apply the corresponding restrictions contained in the clients' plan. By this analysis, the Court would find that whenever state Medicaid makes a payment and the plan participant is dual eligible, the presence of state Medicaid automatically converts the

reimbursement requests. Due to Congressional action, the law now states that timely filing restrictions can apply to Medicaid requests—but only after three years. Furthermore, while Congress exempted Medicaid from certain restrictions in the DRA, it did not exempt Medicaid from several other restrictions such as out-of-network and preauthorization restrictions. The Court presumes that at the time Congress enacted the DRA, it was aware of current law regarding the various restrictions. *See Fed. Deposit Ins. Corp. v. D.L. Faulkner*, 991 F.2d 262, 265 (5th Cir. 1993) (holding that the Court must presume that the legislature "is knowledgeable about existing law pertinent to the legislation is enacts." (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988))).

**16.** In commenting on the fact that assignment statutes are not designed to make state Medic-

aid whole by restoring all out-of-pocket costs, the Supreme Court noted that the Medicaid statues give Medicaid an assigned right to seek reimbursement to the extent of "the legal liability of third parties *to pay for care and services available under the plan.*" *Ark. Dept. Of Health and Human Servs. v. Ahlborn*, 547 U.S. 268, 280–81, 126 S.Ct. 1752, 164 L.Ed.2d 459 (2006) (emphasis in original); *see also Goetz*, 395 F.Supp.2d at 694 (recognizing that state Medicaid reimbursement requests are based on assigned rights that do "not convey to [state Medicaid] any greater rights than the beneficiary has under the policy"). Although the Supreme Court in *Ahlborn* was discussing services instead of expenditures, the Court made clear that the legal liability was for services provided under the plan.

plan participant to "full coverage" status. This would mean that regardless of the coverage that Caremark's client (generally an employer) has agreed to pay for, *any* service rendered (and paid for by state Medicaid) would be due in full.[17]

Under this scheme, a dual eligible would have an incentive to never show a Caremark card and always seek prescriptions via Medicaid. Extinguishing all client plan restrictions by making the application of *any* restriction subject to FCA liability, whether procedural or substantive, and regardless of whether the restrictions discriminate against Medicaid, ultimately forces a client to provide and pay for more coverage to the plan participants that are dual eligibles, compared to the coverage of non-dual eligibles. This approach would force greater liability on behalf of clients who develop and provide coverage plans.[18]

However, despite the flaw in the Government's argument, the Court observes that the district court and Sixth Circuit in *Goetz* decided that in certain circumstances, when attempting to seek reimbursement, state Medicaid essentially gets more rights than the plan participant. 395 F.Supp.2d at 694, 480 F.3d at 788. This conundrum results from the substantive versus procedural dichotomy, and the holding that card presentment and timely filing restrictions are impermissible against Medicaid. In essence, *Goetz* can be read to have given more rights to TennCare than the plan participant when the procedural card presentation/paper

claims and timely filing restrictions were applied. Procedural restrictions pertain to the restrictions that affect *reimbursement* of a claim, and not the substantive coverage in a particular plan. On the other hand, substantive restrictions pertain to restrictions on the type of *coverage* in a particular plan. By applying a card presentation/paper claims or timely filing restriction Caremark was not creating a restriction that was not already in place, but Caremark was in fact, impeding *reimbursement* from state Medicaid, because it was a restriction on the mode or manner of reimbursement. *See* 480 F.3d at 788.

This Court finds the substantive/procedural schematic instructive and analyzes the restrictions at issue in this case accordingly. Therefore, when analyzing the restrictions, the Court will first determine whether such restrictions are procedural or substantive. Then, in accordance with the holding in *Goetz*, the Court will evaluate whether the procedural restrictions discriminate against state Medicaid to determine if they are permissible. *See id.*

### F. Brief Procedural History

Relator initiated her *qui tam* action against Caremark on August 25, 1999. After requesting and obtaining numerous extensions, the Government filed its unsealed complaint-in-intervention on August 19, 2005, alleging violations of the federal FCA, pursuant to 31 U.S.C. § 3729(a)(7), negligent misrepresentation, common law recoupment, and violations of state False Claims Acts and/or Medicaid statutes for the plaintiff states in the lawsuit.[19] The

---

**17.** Inherently, this predicament is a direct result of the complexities of the Medicaid system. State Medicaid agencies try to provide unfettered coverage to beneficiaries, while also trying to obtain reimbursement for expenditures that are covered by third parties. The "pay and chase" system, while providing immediate coverage to the beneficiary, often leaves state Medicaid having to foot the bill for a prescription that should not have been

dispersed, or one that is, for one reason or other, not covered under a third party's plan.

**18.** Furthermore, this would render the substantive/procedural restriction distinction created in *Goetz* meaningless.

**19.** The complaint-in-intervention was also filed on behalf of Texas, Florida, Arkansas, and Tennessee. The plaintiff states that currently remain in this action are Texas, Arkan-

crux of the plaintiffs' Complaint is that Caremark unlawfully denied, reduced, or rejected requests for reimbursement of monies paid for medical care for dual eligibles. The plaintiffs argue that Caremark improperly applied restrictions contained in the health care plans with third party coverage providers in order to reduce or avoid its obligation to pay the government, and that applying such restrictions constituted FCA liability.

In this litigation, the Government's representative capacity is for the federal government, on behalf of other states, and for the VA and also IHS. Both the VA and IHS are authorized by statute, similar to Medicaid, to recover the reasonable cost of medical care and services furnished to dual eligibles. 38 U.S.C. § 1729(b); 25 U.S.C. § 1621e(a).

In July, 2007, both Caremark and the Government filed Motions for Partial Summary Judgment (Docket Nos. 318 & 344). The Court now turns to a discussion of the merits of the Motions.

### IV. Standard of Review

Both Caremark and the Government have moved for partial summary judgment, and have cross-moved with regard to certain issues. Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record, if any, which it believes demon-

strate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Colson v. Grohman, 174 F.3d 498, 506 (5th Cir.1999). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party, however, need not negate the elements of the nonmovant's case. See Wallace v. Tex. Tech Univ., 80 F.3d 1042, 1047 (5th Cir. 1996) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. Celotex Corp., 477 U.S. at 322–23, 106 S.Ct. 2548; Anderson, 477 U.S. at 257, 106 S.Ct. 2505; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. See Nebraska v. Wyoming, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); Celotex Corp., 477 U.S. at 322, 106 S.Ct. 2548. "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." TIG Ins. Co. v. Sedgwick James, 276 F.3d 754, 759 (5th Cir.2002)

sas, Louisiana, and California. Florida and Tennessee withdrew from this case. Significantly, Tennessee, which was at the heart of

the declaratory judgment action in Goetz, chose not to pursue false claims liability against Caremark.

(quoting *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548).

"[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348). All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.*, 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *Messer v. Meno*, 130 F.3d 130, 134 (5th Cir.1997), *cert. denied*, 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *see also Christopher Vill. Ltd. P'ship v. Retsinas*, 190 F.3d 310, 314 (5th Cir.1999).

## V. Applicability of False Claims Act

The crux of this litigation is the plaintiffs' argument that Caremark falsely rejected, denied, or underpaid state Medicaid reimbursement requests for various reasons, thereby invoking liability under the FCA. *Govt's Amended Complaint.* ¶¶ 25–79; 80–87. Specifically, the Government argues that Caremark violated the FCA by rejecting or denying State Medicaid claims, VA claims, and IHS claims, through submitting rejection letters or Explanations of Payment ("EOP") based on certain restrictions in the Caremark-administered plans. The Government argues that it is entitled to reimbursement because the restrictions contained in the plans do not apply to state Medicaid, IHS, or the VA. Furthermore, the Government argues that FCA liability applies when Caremark denies a claim based on restrictions that both exist and do not exist in the corresponding plan.

### A. Presentment

Caremark argues that the Government is barred from asserting FCA claims on behalf of state Medicaid agencies because none of the alleged false statements involving state Medicaid were submitted to the Government. The reverse FCA provision imposes liability when a party "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property *to the Government."* 31 U.S.C. § 3729(a)(7) (emphasis added). Caremark asserts that the FCA requires presentment of a false claim to the (United States) Government, and that Caremark "did not 'present or cause to be presented' false claims" to the Government. *See United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir.2008). Caremark explains that the EOPs and rejection letters were instead submitted to state Medicaid agencies. Caremark points out that the Government has admitted that it does not receive Caremark's EOPs or rejection letters because the state Medicaid agencies administer their own Medicaid programs, and each state Medicaid agency is solely responsible for seeking and obtaining reimbursement.

In response, the Government argues that presentment is not a prerequisite for liability under the reverse false claims provision of the FCA. Furthermore, the Government asserts that even if the Court finds that presentment is a requirement to FCA liability, the Government's claims are still valid because presentment can occur directly or indirectly.

In analyzing this issue, the Court observes that whether or not to read "presentment" into the FCA is a difficult issue that has been somewhat clarified over the course of this litigation. The Court notes that in a recent case, the Supreme Court held that there is no presentment require-

ment in Section 3729(a)(2). *Allison Engine Co. v. United States ex rel. Sanders,* — U.S. —, —, 128 S.Ct. 2123, 2129, 170 L.Ed.2d 1030 (2008). Section (a)(2) uses the same "makes, uses, or causes to be made or used" language found in (a)(7). *See* 31 U.S.C. § 3729(a)(2,7). Subsequent to *Allison Engine,* a very recent Ninth Circuit case used the Supreme Court's analysis to hold "[p]resentment is not an element in a cause of action under § 3729(a)(7)...." *Bourseau,* 531 F.3d at 1169; *see also Allison Engine,* 128 S.Ct. at 2129 (holding that Section 3729(a) (2) requires the government to prove that the defendant made a false statement to get a false claim paid or approved). However, the Supreme Court in *Allison Engine* also acknowledged that "getting a false or fraudulent claim 'paid ... by the Government' is not the same as getting a false or fraudulent claim paid using 'government funds.' " 128 S.Ct. at 2128 (citing *United States ex rel. Sanders v. Allison Engine Co.,* 471 F.3d 610, 622 (6th Cir.2006)).

Despite the Supreme Court's guidance on this issue, this Court need not resolve it today because, in its analysis below, the Court finds pursuant to Section 3729(a)(7), that Caremark did not owe an "obligation" to the Government in regard to denials of reimbursement requests submitted to state Medicaid agencies. Thus, the Government cannot establish FCA liability to the Government on behalf of the state Medicaid agencies.

## B. The False Claims Act

■ As mentioned above, the reverse FCA provision, 31 U.S.C. § 3729(a)(7), imposes liability when a party "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." To prove a reverse false claim violation, the Government must demonstrate that: (1) Caremark had an obli-

gation to pay money to the Government; (2) Caremark used a false statement to avoid or decrease the obligation; (3) the false statement was material; and (4) Caremark made the false statement knowingly. 31 U.S.C. § 3729(a)(7); *see also United States ex rel. Bain v. Ga. Gulf Corp.,* 386 F.3d 648 (5th Cir.2004) (construing Section 3729(a)(7)); *United States v. Southland Mgmt. Corp.,* 326 F.3d 669, 682 (5th Cir.2003); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir.2004). In this Order, the Court analyzes only two of the four elements, obligation and falsity, because those are the two elements in dispute by the Government and Caremark in their respective Motions for Partial Summary Judgment. While the Court recognizes all four elements are necessary to prove a FCA claim, the Court will limit its discussion today to falsity and obligation. *See Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194–95 (5th Cir.1986) (holding that if the movant bears the burden of proof, it "must establish beyond peradventure *all* of the essential elements of the claim") (emphasis in original); *Morgan v. Neiman–Marcus Group, Inc.,* No. 305CV0079G, 2005 WL 3500314, at *2 n. 2 (N.D.Tex. Dec. 20, 2005) (denying plaintiff's motion for partial summary judgment because she failed to demonstrate right to relief on entire claim on which she had burden of proof).

### 1) Falsity

■ The Court grants summary judgment in favor of Caremark on the element of falsity for claims where Caremark denied Medicaid reimbursement requests based on restrictions that were contained in a client's plan, and were therefore not false. This finding applies to reimbursement requests that were submitted and then denied before the decision in *Goetz* in 2005. This does not apply to denials based on card presentation/paper claims or time-

ly filing restrictions after *Goetz*.[20] The reverse FCA provision imposes liability when a party makes a *"false record or statement"* to avoid an obligation to pay the Government. 31 U.S.C. § 3729(a)(7) (emphasis added). The Government argues that by applying plan restrictions to reject Medicaid reimbursement requests, Caremark made a false record or statement that subjected it to liability under the reverse claims provision of the FCA.

The Court disagrees, and finds that for claims where Caremark applied a restriction to deny a state Medicaid request for reimbursement, and the restriction actually existed in the corresponding plan, the Government cannot establish that Caremark made a "false record or statement" and FCA liability does not apply. *See United States ex rel. Roby v. Boeing Co.*, 100 F.Supp.2d 619, 629 (S.D.Ohio 2000); *United States ex rel. Milam v. Regents of Univ. of Cal.*, 912 F.Supp. 868, 883 (D.Md. 1995); *see also United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir.2004). Furthermore, the law surrounding reverse FCA claims is unclear. Because there was (and still is) a

good-faith disagreement over a complex area of law regarding whether a plan restriction could be applied, applying the existing restriction is not a false statement or record under the FCA. *Southland Mgmt.*, 326 F.3d at 682; *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir.1999); *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477 (9th Cir.1996). Moreover, the FCA is not a catchall provision, and if by law an existing restriction cannot be applied to a state Medicaid request, and such a restriction was applied, statutory remedies for compliance and reimbursement are appropriate, not the FCA. *Lamers*, 168 F.3d at 1019; *Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir.2001); *United States ex rel Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997). Finally, the FCA is a punitive statute in nature and therefore must be carefully construed against the Government.[21] *United States ex rel Weinberger v. Equifax, Inc.*, 557 F.2d 456, 460 (5th Cir.1977); *United States ex rel. Atkins v. McInteer*, 345 F.Supp.2d 1302, 1304 (N.D.Ala.2004).

**20.** Whether or not FCA liability applies when Caremark denies reimbursement based on timely filing or card presentation/paper claims restrictions after the *Goetz* decision. Furthermore, for claims that actually allege Caremark made a false statement, for example, that a reimbursement request was denied based on a restriction that was not actually in the corresponding plan, those claims may be permissible under the FCA.

**21.** In contrast, a different analysis may apply to card presentation/paper claims and timely filing restrictions applied after *Goetz* (and within the three year limitation provided by the DRA). This is also the case for claims where Caremark applied a restriction to deny state Medicaid requests, and no such a restriction existed in the corresponding plan. However, the Court will not address the applicability of the FCA in these scenarios in this Order.

The Court further observes that another requirement for a reverse FCA claim is that of materiality. *Southland Mgmt.*, 326 F.3d at 679–82 (J. Jones concurring) (explaining that materiality is an element of the United States's FCA cause of action upon which it carries the burden of proof). However, in order to address this element, additional analysis is necessary before determining possible FCA liability. *Id.* The Fifth Circuit has held that for a false statement to be actionable under the FCA, the statement must be material. *Id.* Materiality depends on whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action. The Government never contested the denials until it intervened in this FCA action.

Additionally, the Court observes that the Government must also prove the "knowing" element for FCA culpability, which may be more appropriate for a jury.

### i. A True Statement is not False under the False Claims Act

An essential element to a reverse false claims act claim is actual falsity. *United States ex rel. Roby v. Boeing Co.*, 100 F.Supp.2d 619, 629 (S.D.Ohio 2000) ("At a minimum, the FCA requires proof of an objective falsehood."). The Government alleges that this element is satisfied because Caremark made false statements to the Government when it denied or reduced a Medicaid reimbursement request by stating that the participant's plan did or did not have certain coverage. As Caremark points out, for many of the allegedly false claims asserted by the Government, the basis of Caremark's denial of the reimbursement requests were restrictions that were existing in the participant's plan at the time of the claim.

To the extent the Government and the other plaintiffs in this case base their reverse false claims on Caremark applying a restriction in accordance with the client's plan—that is, a restriction that accurately existed at the time the request for reimbursement was made—Caremark has made a true statement and Plaintiffs have failed to establish falsity. "False Claims Act liability cannot be imposed on the basis of a literally true statement." *United States ex rel. Milam v. Regents of Univ. of Cal.*, 912 F.Supp. 868, 883 (D.Md.1995); *see also Riley*, 355 F.3d at 376 (stating that "the FCA requires a statement known to be false, which means a lie is actionable but not an error"). Stating that a plan restriction exists, when it actually does, is not a false statement to the Government.

The Government further argues that attempting to apply any restriction, whether it actually exists in the corresponding plan or not, violates the FCA. That is, since restrictions, in and of themselves, cannot apply to Medicaid—and both Caremark and the Government were aware of this— Caremark's statement that a restriction "applies" to deny reimbursement constitutes a lie. The Court disagrees and finds that Caremark made a true statement in those situations where Caremark applied a restriction that actually existed in the corresponding plan. In other words, the application of a restriction contained in the corresponding plan was not a lie that triggered FCA liability.

However, Caremark's argument that a true statement cannot be false is not limitless. While it may be factually true that a certain restriction exists in a corresponding plan, if an existing statute or case law has clearly deemed the restriction to be impermissible against Medicaid, then Caremark's statement denying a reimbursement request based on the restriction would be inconsistent with governing law.[22] For example, Caremark cannot apply a restriction that has clearly been deemed impermissible by the DRA, and claim that the restriction's presence in the corresponding plan necessarily obfuscates Caremark from FCA liability.

The Government further argues that all of the restrictions at issue in the instant case are procedural and all procedural restrictions discriminate against Medicaid and are therefore false statements under the FCA. The Court observes that to label all restrictions procedural would undermine the substantive versus procedural test in *Goetz*. While the Court has yet to analyze all of the restrictions at issue in this case, it disagrees with the Government's position that *all* of the restrictions are procedural. This is further emphasized below where the Court finds that out-of-network and preauthorization restrictions are substantive, rather than procedural restrictions. Furthermore, the Government's argument jumps an impor-

---

**22.** It appears that Caremark concedes this point. *See Caremark's Resp.* at 4.

tant part of the Sixth Circuit's analysis in *Goetz*. The Government appears to argue that procedural restrictions by their very nature discriminate against Medicaid. This was not the holding in *Goetz*. Instead, the Sixth Circuit held that procedural restrictions were impermissible *if* they discriminated against Medicaid. 480 F.3d at 788. The Government's position in the instant case further solidifies the argument that the law governing the restrictions at issue in this case is far from clear.

### ii. A Claim Cannot Be False When the Law is Unclear and There is a Legitimate Good Faith Disagreement About the Applicable Governing Law

■ Caremark's notifying state Medicaid, IHS, and the VA that a restriction applies based on a client's plan is not a false statement or record under the FCA because the law is unclear. Furthermore, because there was and still is a good-faith disagreement over a complex area of law regarding whether a plan restriction can be applied, applying an existing restriction is not a false statement or record under the FCA. *Southland Mgmt.*, 326 F.3d at 682; *Lamers,* 168 F.3d at 1018; *Hagood,* 81 F.3d at 1477. Because of this good-faith legal dispute, Caremark's EOPs and rejection letters informing Medicaid of the restrictions are not false. *See Southland Mgmt.*, 326 F.3d at 682 (Jones, J. concurring) ("Where there are legitimate grounds for disagreement over the scope of a contractual or regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim."); *United States ex rel. Farmer v. City of Houston,* 523 F.3d 333, 340 n. 12 (5th Cir.2008) (citing *Southland Mgmt.*, 326 F.3d at 684) (Jones, J., concurring) ("[I]f the regulations were thoroughly unclear, as a matter of law, the FCA's knowledge and falsity requirements have not been

met."); *Lamers,* 168 F.3d at 1018 ("[D]ifferences in interpretation growing out of a disputed legal question are similarly not false under the FCA."); *Hagood,* 81 F.3d at 1477 ("How precise and how current the cost allocation needed to be in light of the [Water Supply Act's] imprecise and discretionary language was a disputed question within the [government]. Even viewing [the plaintiff's] evidence in the most favorable light, that evidence shows only a disputed legal issue; that is not enough to support a reasonable inference that the allocation was *false* within the meaning of the False Claims Act.") (emphasis in original).

Throughout the course of this litigation, there continue to be legitimate grounds for disagreement over the scope of regulatory provisions regarding which existing health plan restrictions can be applied to state Medicaid when state Medicaid is assigned the rights of a plan participant. Because of this existing legitimate disagreement over the broad and imprecise language of the Medicaid, IHS, and VA statutes, Caremark's application of restrictions pursuant to its clients' plans does not subject it to FCA liability. *See Southland Mgmt.*, 326 F.3d at 682 (citing Jones, J. concurring).

Furthermore, this legitimate dispute based on a complex area of law is compounded by the fact that prior to *Goetz,* the existing law gave the implication that plan restrictions could be applied to Medicaid in accordance with a health plan. *See Belshe v. Laborers Health & Welfare Trust Fund for No. Cal.,* 876 F.Supp. 216, 222 (N.D.Cal.1994); *Mich. Dept. of Soc. Servs. v. Shalala,* 859 F.Supp. 1113, 1117 (W.D.Mich.1994). A claim consistent with governing law cannot be false. *United States ex rel. Glass v. Medtronic, Inc.,* 957 F.2d 605, 608 (8th Cir.1992); *United States ex rel. Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 732 (7th Cir.1999) (affirming summary judgment dismissal of an FCA

claim, explaining that "when a [party] complies with the existing regulations, it is entitled to represent to the government (and the world) that it has done so, without facing a claim of deception"); *United States ex rel. Gathings v. Bruno's Inc.*, 54 F.Supp.2d 1252, 1257 (M.D.Ala.1999) (dismissing FCA claims against drug suppliers for charging higher rates to Medicaid than other payers because regulations did not require defendants to charge Medicaid the lowest rate charged to other payers).

In the instant case, the Government does not establish a regulatory violation beyond stating that the legislative history shows that Medicaid is the payor of last resort. The Government, as well as the other plaintiffs, cannot point to anything in the Medicaid statutes that objectively defines what plan restrictions can and cannot be applied when third party coverage exists and state Medicaid is seeking reimbursement. Instead, the Government argues that broad statutory interpretation concluding that Medicaid is the "payor of last resort" is sufficient to establish clear law that when Caremark processes claims, it cannot apply any applicable plan restriction to state Medicaid.[23] In essence, the Government argues that state Medicaid's presence eviscerates all elements of a health plan as applied to state Medicaid and entitles it to full reimbursement regardless of the plan's coverage.

Conversely, Caremark argues that the Government alleges it violated the FCA by failing to comply with a law that, in actuality, does not exist. After examining good-faith arguments over a complex area of

law, the district court and Sixth Circuit in *Goetz* determined that card presentation and timely filing restrictions could not be applied to state Medicaid. 395 F.Supp.2d at 694, 480 F.3d at 788. However, beyond availing that Medicaid is the "payor of last resort," *Goetz* did not establish that Medicaid regulations specifically prevent PBMs from applying existing restrictions. Despite the district court's clarification that the Medicaid scheme should be read to disallow card presentation and timely filing restrictions to state Medicaid agencies (because they are procedural and discriminate against Medicaid), the court stated that any such application prior to *Goetz* was based on a good-faith disagreement about a the law. *Goetz*, 395 F.Supp.2d at 696.

This Court finds instructive the court's admonition. The district court in *Goetz* was well aware of the pending *qui tam* action in this Court (because the Government attempted to remove the case to Texas). It made it clear by adding an admonition in the last paragraph that, "[a]lthough the Court concludes that the [Government's] position is more persuasive, this dispute is based on good faith disagreement about a complex area of law." *Id.* This suggests that the court would not have recognized FCA liability with regard to the Government's claims in this case.

The Sixth Circuit determined that since the legislative history shows that Congress titled the relevant section a "clarification" of third party responsibilities for payment, the previous restrictions in question were impermissible when applied.[24] The need

**23.** If all restrictions are unlawful as the Government argues, there would have been no reason for Congress to put a time limit on timely filing and card presentation restrictions when it enacted the DRA. Congressional action in 2006 can be comported with the reasoning in *Goetz*. It appears that Congress—in accordance with the test laid out in *Goetz*—determined that timely filing and card

presentation/paper claims restrictions after three years can apply, and therefore do not discriminate against Medicaid. As an aside, the Court further observes that Congress did not create a similar exemption for network or preauthorization restrictions, which this Court further addresses below.

**24.** Note that under the auspicious of "clarification," Congress also clarified that for a

for such clarification comports with the district court's acknowledgment that the dispute between Caremark and the Government (and TennCare) was premised on a good faith disagreement of a complex area of law. Because Caremark's application of restrictions was based on a good faith disagreement, it does not subject Caremark to FCA liability.

This Court's decision today is consistent with the *Goetz* decisions. Furthermore, it is important to note that FCA liability was not at issue in *Goetz;* instead, the case was filed as a declaratory judgment. 395 F.Supp.2d at 684. Even if this Court accepted the Government's argument that the law is clear, which it is not, and that certain restrictions can never apply to Medicaid, the Court is of the opinion that the FCA is the wrong vehicle for a remedy. Courts are currently struggling over the interpretation of the Medicaid statutes and the law remains unclear.

However, *Goetz* made it clear that *certain* plan restrictions do not apply to Medicaid. Thus, under *Goetz,* Caremark (or the client with which Caremark contracted to create the health plan) can be required to reimburse state Medicaid for funds owed; however, penalties and treble dam-

ages under the FCA would not be appropriate before *Goetz* because there was a legitimate legal dispute.[25] Until *Goetz,* the case law indicated that plan restrictions do apply to Medicaid. In essence, the case law pre-*Goetz* suggests that Medicaid was subject to the same plan restrictions as the plan participant. It was not until *Goetz* in 2005, that a court said otherwise, or drew a distinction between certain types of restrictions.

### iii. The FCA is a Punitive Statute

Although the FCA has a broad reach, it is a punitive statute. *Vt. Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 784, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). In *Stevens,* the Supreme Court stated that "the current version of the FCA imposes damages that are essentially punitive in nature . . . ." *Id.* The Court continued that "[a]lthough this Court suggested that damages under an earlier version of the FCA were remedial rather than punitive . . . that version of the statute imposed only double damages and a civil penalty of $2,000 per claim, . . . the current version, by contrast, generally imposes treble damages and a civil penalty of up to $10,000 per claim." *Id.; see also*

timely filing restriction to be impermissible the, state must submit the claim within three years. *See* 42 U.S.C. § 1396a(a)(25)(I). Under the presumption that the DRA was simply a clarification of what the law always was, and not that the DRA was finally making certain restrictions impermissible, the Government must therefore also accept that under this clarification, some claims become stale.

**25.** The law until *Goetz* is almost only statutory. The statute says the individual "assign[s] the State any rights . . ." or that beneficiaries assign to the Medicaid agency their rights to medical "support" and "payment for medical care from any third party." 42 U.S.C. § 1396k(a)(1)(A). As previously mentioned, other courts before *Goetz* had in fact indicated that plan restrictions do apply to Medicaid.

*See Belshe,* 876 F.Supp. at 222; *Shalala,* 859 F.Supp. at 1117. Additionally, CMS remained silent regarding how PBMs should or should not apply restrictions. While it can be validly disputed whether Caremark should or should not have imposed restrictions in accordance with a plan, applying a valid plan restriction is not a basis for FCA liability.

For example, not until the *Goetz* decision in October 2005 was there clear indication that although a plan participant was restricted from sending in an after-the-fact reimbursement based on his plan, when state Medicaid sent in the very same after-the-fact reimbursement request, the restriction did not apply. The plaintiffs in this lawsuit are alleging FCA liability based on claims dating back as early as 1993, twelve years before *Goetz* was decided.

*Tex. Indus. Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."); *Equifax, Inc.,* 557 F.2d at 460 ("The penal nature of the [FCA] requires careful scrutiny to see if the alleged misconduct violates the statute."); *Atkins,* 345 F.Supp.2d at 1304 ("[B]ecause the FCA has a quasi-criminal aspect (treble damages), it must be strictly construed against the United States and relator."). Therefore, because the FCA is punitive in nature, doubts about whether the statutory reaches of the FCA can be stretched to implicate Caremark's conduct should be construed against the Government and the other plaintiffs.

■ Furthermore, the Fifth Circuit has observed that "[t]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of agency restrictions are not fraud unless the violator knowingly lies to the government about them." *Southland Mgmt.,* 326 F.3d at 682 (citing *Lamers,* 168 F.3d at 1019). The Fifth Circuit further explained that "services rendered in violation of a statute do not necessarily constitute false and fraudulent claims under the FCA." *Farmer,* 523 F.3d at 340 n. 12; *See also United States ex rel. Hopper v. Anton,* 91 F.3d 1261 (9th Cir.1996) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA."). The Ninth Circuit has gone so far to state that false does not mean "sci-

entifically" untrue; it means a lie. *Pfingston v. Ronan Eng'g,* 284 F.3d 999, 1003 (9th Cir.2002); *see also United States ex rel. Taylor v. Gabelli,* 345 F.Supp.2d 313, 329 (S.D.N.Y.2004) ("Courts have found ... that 'errors based simply on faulty calculations or flawed reasoning,' 'imprecise statements or differences in interpretation growing out of disputed legal question,' and scientific judgments are not false under the FCA.' " (quoting *Lamers,* 168 F.3d at 1018)).[26] Thus, the FCA does not apply to conduct that is in accordance with the law, nor in instances of regulatory noncompliance. *Southland Mgmt.,* 326 F.3d at 677; *Medtronic,* 957 F.2d at 608.

As previously stated, this case revolves around imprecise regulations and differences in interpretation that arise from a disputed legal question. To label all plan restrictions as discriminatory against Medicaid and therefore subject Caremark to punitive damages under the FCA, would be unfair.

### iv. The FCA is Not a Catchall Provision

Finally, the FCA is not a catch-all enforcement vehicle for all government regulations, particularly those that provide for their own remedy. *See, e.g., Lamers,* 168 F.3d at 1019 ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations."); *United States ex rel. Mikes v. Strauss,* 274 F.3d 687, 699 (2d Cir.2001) ("[T]he False Claims Act was not designed for use as a blunt instrument to enforce compliance with all medical regulations ...."). In-

---

**26.** "Because the Supreme Court has held that the FCA is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government,' a number of courts have interpreted the phrase 'false or fraudulent' broadly. But even liberally construed, 'false or fraudulent' is subject to some limitations." *United States ex rel.*

*Taylor v. Gabelli,* 345 F Supp 2d 313, 329 (S.D.N.Y.2004) (quoting *United Staes ex rel. Augustine v. Century Health Serv., Inc.,* 289 F.3d 409, 413 (6th Cir.2002)). While Section 3729(a)(7) does not contain the language "false or fraudulent," instead making culpable a "false record or statement," the same analysis applies.

stead, if by law an existing restriction cannot be applied to a state Medicaid request, and such a restriction was applied, statutory remedies for compliance and reimbursement are appropriate, not the FCA. *Lamers*, 168 F.3d at 1019; *United States ex rel. Mikes v. Strauss*, 274 F.3d 687, 699 (2d Cir.2001).

Even if this Court was to decide that applying restrictions constitutes a false statement, FCA liability could be pursued only for the restrictions that have been made impermissible as applied, which currently include timely filing and card presentation/paper claims restrictions only. No court has ruled with regard to any other restrictions; nor has Congress prohibited other restrictions. Additionally, CMS has not made findings as to any of the other plan provisions.

For the foregoing reasons, when Caremark notified state Medicaid that a restriction in a health plan prohibited reimbursement of a claim, and that restriction actually existed in the corresponding plan for all claims pre-*Goetz*, Caremark is not subject to FCA liability. A similar finding applies to restrictions where the law is unclear on how they do or do not apply to Medicaid.

### 2) Obligation

There is a real question about whether Caremark owes an "obligation" under 31 U.S.C. § 3729(a)(7) to any of the plaintiffs in this lawsuit, or if instead, the more appropriate party is the third party coverage provider. The Court will not address this question at this juncture. Furthermore, this Order should not be read to establish that Caremark has any obligation with regard to the claims that are the subject of this lawsuit. However, it is clear to the Court that regardless of who has the obligation, Caremark does not have any obligation to the Government for denials of reimbursement requests that

Caremark submitted to state Medicaid agencies. Whether Caremark has an obligation under Section 3729(a)(7) to the various state Medicaid agencies, or to the Government for denials of reimbursement requests to IHS or the VA, remains an open issue. In this Order, the Court will limit its discussion and finds that the Government cannot bring reverse FCA claims against Caremark on behalf of the state Medicaid agencies.

The parties dispute whether Caremark owes an obligation to the Government under 31 U.S.C. § 3729(a)(7). Section 3729(a)(7) creates liability "where the defendant owes a payment or obligation to the government and submits a false claim or statement to avoid that payment obligation." *United States ex rel. Gay v. Lincoln Tech. Inst., Inc.*, No. 301CV505K, 2003 WL 22474586, *5 (N.D.Tex. Sept. 3, 2003) (citing *United States ex rel. Doe v. Dow Chem. Co.*, 343·F.3d 325 (5th Cir. 2003)); *see also United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 444 (3d Cir.2004). "Section 3729(a)(7) is described as a 'reverse false claims' provision 'because the *financial obligation* that is the subject of the fraud flows in the opposite of the usual direction.'" *United States ex rel. Bahrani v. Conagra*, 465 F.3d 1189, 1195 (10th Cir.2006) (citing *United States ex rel. Huangyan Imp. & Exp. Corp. v. Nature's Farm Prods.*, 370 F.Supp.2d 993, 998 (N.D.Cal.2005)) (emphasis added). When Congress amended the FCA in 1986 and added the reverse false claim provision, it also added a provision defining the word "claim" in the context of the statute (Section 3729(c)), giving the term an expansive meaning. But it did not provide a definition for "obligation" under Section 3729(a)(7). *See id.*, Section 3729(a), (c). Courts have construed the definition of "obligation" narrowly. *Conagra*, 465 F.3d at 1195; *Kennard v. Comstock Res. Inc.*, 363 F.3d 1039, 1048 (10th Cir.2004); *Unit-*

ed States v. Pemco Aeroplex, Inc., 195 F.3d 1234, 1236–37(11th Cir.1999); Am. Textile Mfrs. Inst., Inc. v. The Limited, Inc., 190 F.3d 729, 736 (6th Cir.1999); United States v. Q Int'l Courier, Inc., 131 F.3d 770, 773 (8th Cir.1997).

In interpreting the "obligation" element under Section 3729(a) (7), courts have held somewhat different standards for what constitutes an obligation in the reverse false claims context. Some courts require that the defendant has an independent legal duty to pay the Government at the time the false statement is made. See Am. Textile Mfrs. Inst., 190 F.3d at 736; Conagra, 465 F.3d at 1195; Q Int'l Courier, 131 F.3d at 773–74. Other courts require a specific economic relationship between the defendant and the Government. See United States ex rel. Marcy v. Rowan Cos., Inc., 520 F.3d 384, 390 (5th Cir.2008); Bain, 386 F.3d at 657. While the Fifth Circuit has addressed the reverse false claims provision of the FCA in certain cases, it has not yet addressed the extent of what constitutes an obligation in the context of a reverse false claim involving state Medicaid. After considering the differing analyses of "obligation" by various courts, the Court finds Caremark does not owe an obligation to pay the Government under Section 3729(a)(7) for the alleged false claims to state Medicaid that are the subject of this lawsuit. Caremark did not have an existing obligation to pay the Government at the time the allegedly false statements were made.[27] Furthermore, Caremark did not have a specific economic relationship with the Government, independent of any relationship with the state Medicaid agency.[28]

### i. Collateral Estoppel

] The Court first addresses the Government's argument that collateral estoppel bars litigation of certain issues in this case. Collateral estoppel "applies to bar litigation of an issue previously decided in another proceeding by a court of competent jurisdiction." Copeland v. Merrill Lynch & Co., Inc., 47 F.3d 1415, 1422 (5th Cir.1995). A party is collaterally estopped from re-litigating an issue if: (1) the issue at stake in the pending litigation is the same as the one previously litigated; (2) the issue was actually litigated; and (3) the determination of the issue in the initial litigation was a necessary part of the judgment. Harvey Specialty & Supply, Inc. v. Anson Flowline Equip., Inc., 434 F.3d 320, 323 (5th Cir.2005); see also Copeland, 47 F.3d at 1422 (requiring a fourth element that there are no special circumstances that would make it unfair to apply the doctrine of collateral estoppel).

The Government argues Caremark is collaterally estopped from re-litigating certain issues that were established in Goetz, 480 F.3d at 779. Specifically, the Government argues the Sixth Circuit "conclusively determined" that Caremark's obligation to pay Medicaid requests for reimbursement cannot be avoided through applying procedural plan restrictions. Therefore, the Government claims Caremark is prevented from re-litigating this point.

 The Court first points out that the Government's argument does not include the full holding from the Sixth Circuit in Goetz, which is that Caremark cannot apply plan procedural restrictions that are deemed discriminatory against Medicaid. Id. at 788 (emphasis added). The Court also observes that, as previously men-

---

**27.** Again the Court reiterates that whether or not Caremark owes an obligation to state Medicaid agencies for reverse false claims under Section 3729(a)(7) is an open question.

**28.** This finding does not apply to the question of whether Caremark had an "obligation" to IHS or the VA.

tioned, *Goetz* was a declaratory judgment action and the Sixth Circuit did not analyze whether Caremark owed an obligation *to the Government* under the FCA, or that Caremark's application of certain restrictions to reject reimbursement requests violated provision of the FCA, because these issues were not raised in that case. By contrast, the instant case involves allegations of reverse FCA violations. Because the elements of *any* provision of the FCA were not before the court in *Goetz,* this Court finds collateral estoppel does not apply with regard to FCA claims. Therefore, Caremark is not precluded from arguing that it does not owe the Government an obligation under the FCA, or that the application of plan restrictions does not result in FCA liability. This is in accordance with the Court's oral ruling during the hearing in January that collateral estoppel does not apply to the issues in the instant case.

The Government further argues that the Sixth Circuit's decision in *Goetz* that card presentation and timely filing restrictions were impermissible, prevents re-litigation of this issue. The Government also seeks to expand this ruling to other restrictions, which the Government deems procedural, such as preauthorization requirements and out-of-network restrictions.

Caremark explains it is not attempting to re-litigate whether timely filing and paper claims restrictions may be applied to a state Medicaid agency because *Goetz* established they could not. *Caremark's Resp.* at 23. Recognizing that the DRA specifically exempted Medicaid from paper claims restrictions, timely filing restrictions of less than three years, and restrictions based on the format of the claim form, Caremark asserts it is not trying to re-litigate *Goetz.* However, Caremark argues that *Goetz* did not determine whether Caremark's actions of applying restrictions avoided an obligation under the FCA, or

whether Caremark has an independent legal duty to pay the Government. The Court agrees and finds that Caremark is not collaterally estopped from arguing that applying any such restrictions, whether procedural or substantive, does not subject Caremark to FCA liability. Accordingly, the Court denies summary judgment for the Government as to the collateral estoppel claim.

### ii. Analysis of the "Obligation" Element Under the Sixth, Eighth, and Tenth Circuits

█ Both the Sixth and Tenth Circuits have held that an "obligation" in the reverse false claims context must arise from an independent legal duty. *Am. Textile Mfrs. Inst.,* 190 F.3d at 736; *Conagra,* 465 F.3d at 1195 (stating "whatever the scope of the phrase 'obligation to pay or transmit money or property to the Government,' a plaintiff may not state a reverse false claim unless the pertinent obligation attached") (internal citation omitted). To establish a *prima facie* case of liability under Section 3729(a)(7), "the plaintiff must prove that the defendant did not pay back to the government money or property *that it was obligated to return."* United States ex rel. Quinn v. Omnicare Inc., 382 F.3d 432, 444 (3d Cir.2004) (emphasis added).

Furthermore, the Sixth, Eighth, and Tenth Circuits have stated that the independent legal duty must exist at the time the false statement was made. *Conagra,* 465 F.3d at 1195 (requiring that the obligation attach "before the defendant made or used the false record or statement"); *Am. Textile Mfrs. Inst.,* 190 F.3d at 736 (stating that "a reverse false claim action cannot proceed without proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation"); *see also Q Int'l Courier,* 131 F.3d at 773–74 (stating that the FCA requires a "fixed sum that is

immediately due" and that in order "[t]o recover under the False Claims Act, we believe that the United States must demonstrate that it was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used [and][t]he obligation cannot be merely a potential liability ...' "). Furthermore, courts have interpreted "obligation" narrowly and require the plaintiff "to allege that the defendant had *an existing legal obligation* to pay or transmit money or property to the government.' " *Conagra*, 465 F.3d at 1195 (quoting *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1048 (10th Cir.2004)) (emphasis in original).

Using the Sixth, Eighth, and Tenth Circuit analyses of the obligation element, the Government has provided insufficient evidence to establish that Caremark possessed an independent legal duty to pay the Government at the time Caremark rejected state Medicaid reimbursement requests. Without any analysis, the Government argues that Caremark's obligation to pay the Government existed at the time Caremark processed reimbursement re-

quests from the Government, the VA, and IHS, and that the federal and state statutory and regulatory schemes "unambiguously establish this obligation." *Gov.'s Mot. for Partial Summ. J.* at 10. The Government further claims that the Sixth Circuit's determination in *Goetz* "conclusively answered" the question of whether Caremark can avoid the obligation in instances where its client's health plan contained plan restrictions such as those that are at issue in this case. *Id.* at 11.

■ The Court first observes that the federal and state statutory and regulatory schemes do not establish an obligation on behalf of a PBM such as Caremark to pay the Government. In fact, the third party liability provisions that the Government points to only require *state Medicaid agencies* to implement third party liability provisions *in order to qualify under the Medicaid program*. 42 U.S.C. § 1396a(a)(25)(A).[29] There is no mention in the statutory text that PBM's are "obligated" to pay the Government or that PBMs have an independent legal duty to the Government as to state Medicaid matters. *See id.* § 1396a(a).[30]

---

**29.** Furthermore, the third party liability provisions provide that if a state receives federal funding in Medicaid payments, known as FFP, "for which it receives third party reimbursement, the State *must pay the Federal government* a portion of the reimbursement" in accordance with the federal Medicaid assistance percentage. 29 C.F.R. § 433.140 (emphasis added). Therefore, if an obligation to pay the Government exists in the Medicaid context, it appears it is the state that owes such an obligation.

**30.** As previously mentioned, the Court's discussion of "obligation" in this Order is limited to whether Caremark owes an obligation *to the Government* under Section 3729(a)(7). The Court does not address whether Caremark owes an obligation to state Medicaid agencies under (a)(7). This would require the Court to consider whether it is Caremark that owes the plan participant an obligation

(which then translates into an obligation to state Medicaid), or if legal liability lies with the third party coverage provider. Contractually, it is clear that Caremark's duty is to its client, the third party coverage provider. And it is the third party coverage provider and the plan participant that enter into an agreement together. This issue has not been thoroughly briefed and the Court therefore limits its analysis to whether Caremark owes the Government an obligation in the FCA context.

However, regardless of whether Caremark owes state Medicaid an obligation in this context, the Court's analysis of the "falsity" element above applies equally to state Medicaid, IHS, and the VA. Thus, even if the various state Medicaid agencies could establish obligation, they would still be limited in pursuing their claims of alleged false statements within the confines of the Court's analysis on falsity above.

Moreover, Caremark's position that it does not owe a legal obligation under the FCA to the Government is further supported by statements of congressional members that occurred when Congress enacted the DRA. For example, Senator Grassley stated:

Yes, I want to clarify the intent is not to create an additional liability where none exists .... It is my understanding that the health plan or employer contracting with the pharmacy benefit manager is ultimately at risk for the underlying claim, so it is my belief that this will not create new liability for the pharmacy benefit manager.

151 Cong. Rec. S14202–02 (2005). Similarly, in the House, Chairman Joe Barton explained that the DRA,

[A]mends the list of third parties ... [who have] legal liability to pay for medical care and services available under the state's Medicaid plan. The provision adds "pharmacy benefit managers" to this list, and introduces a new phrase "legally responsible for payment of a claim for a health care item or service." ... This addition is not meant to make pharmacy benefit managers liable when they are acting merely in an administrative capacity on behalf of a liable third party.

151 Cong. Rec. H37–01 (2006). Thus, it appears that when the DRA was enacted, at least certain members of Congress believed that it did not extend liability to "administrators" or create new liability for PBMs such as Caremark.

Furthermore, the question of whether Caremark, as a PBM that *administered* third party health plans, had an "obligation" to the Government under Section 3729(a)(7), was not addressed in *Goetz*, 480 F.3d 779 (6th Cir.2007). While the Sixth Circuit determined in *Goetz* that certain restrictions were impermissibly applied by Caremark to reject requests for reim-

bursement from Tennessee Medicaid, the context of the court's analysis was limited to the statutory language of the relevant Medicaid statutes. *Id.* at 788–89. The court did not analyze claims under the FCA; nor did it consider whether Caremark owed an "obligation," as defined in Section 3729(a)(7), to the federal government or to state Medicaid agencies. The Court stated "[i]t is undisputed that a health insurer (such as Caremark) has a legal liability to pay for care and services available under its health plan and that a Medicaid agency (such as TennCare) can seek reimbursement up to the amount of this legal liability." *Id.* at 789.

The Court observes that Caremark is not a health insurer, as suggested in the *Goetz* decision. The Court agrees with the Sixth Circuit's determination that *a health insurer* (or a health plan sponsor that enters into a contract with a plan participant) has a legal liability to pay for care and services under its health plan, but disagrees with the determination that Caremark is a health insurer. *See id.* Nonetheless, this distinction does not mean that Caremark is somehow exempt from the court's holding in *Goetz*; instead, Caremark must comply with the court's decision by refraining from applying those restrictions deemed impermissible through the administration of its client's plans. Nor does the Court's distinction absolve Caremark from liability for statutory reimbursement of payments rejected based on restrictions that are deemed discriminatory against Medicaid and therefore impermissible. It is undisputed that Caremark distributes payments for its clients based on the provisions in the health care plan. Furthermore, the Sixth Circuit determined in *Goetz* that Caremark cannot apply impermissible restrictions (*i.e.,* card presentation and timely filing restrictions) to reduce its legal liability to pay for services available through its clients health

plan. However, the court's holding does not necessarily translate into an "obligation" under the FCA and certainly is not synonymous with an "obligation" to the Government.

### iii. Analysis of the "Obligation" Element in the Fifth Circuit

The Fifth Circuit has taken a somewhat different approach to analyzing liability under the FCA for reverse false claims by stating what *does not* constitute "obligation" in the context of a reverse false claim. *Marcy,* 520 F.3d at 390. In *Marcy,* a case recently decided by the Fifth Circuit, the court relied on its prior holding in *Bain* to address the obligation element of an allegedly reverse false claim. The Court stated as follows:

> [T]he reverse false claims act does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted) and which do not arise out of an economic relationship between the government and the defendant (such as a lease or a contract or the like) under which the government provides some benefit to the defendant wholly or partially in exchange for an agreed or expected payment or transfer of property by (or on behalf of) the defendant to (or for the economic benefit of) the government.

*Id.* at 391 (quoting *Bain,* 386 F.3d at 657). This Court recognizes that *Marcy* and *Bain* have a different fact pattern than the instant case because both involve defendants who allegedly submitted false reports to avoid penalties or fines due to certain violations under a particular statute. *See Marcy,* 520 F.3d at 386 (defendant alleged to have violated the Federal Water Pollution Control Act to Prevent Pollution from Ships by failing to report the discharge of oil or hazardous sub-

stances are required by statute); *Bain,* 386 F.3d at 651 (defendant alleged to have submitted false records to the Environmental Protection Agency to hide violations of certain environmental laws and avoid fines and other monetary assessments).

While the Government argues that Caremark's allegedly false statements were made to avoid payment in violation of the Medicaid statutes, there is no mention of a fine or penalty in the instant case that depended on "intervening discretionary governmental acts." *See Marcy,* 520 F.3d at 391. Thus, the Court's analysis is confined to the second part of the Fifth Circuit's test in *Bain,* which is whether there is an economic relationship *between the government and the defendant* (such as a lease or a contract or the like) where the government provides *some benefit* to the defendant in exchange for a payment or transfer of property *by the defendant* to (or for the economic benefit of) the government. 386 F.3d at 657 (emphasis added).

It appears the Government contends that since the Government plays a significant role in creating Medicaid, an implied economic relationship exists. The Government asserts that regardless of the fact that plan participants specifically assign their rights to state Medicaid, an implicit or potential economic relationship with the Government still exists. However, the Fifth Circuit's holding in *Bain* and *Marcy* stand for the proposition that the Government must provide some benefit to Caremark in exchange for an agreed payment by Caremark to the Government (or for the Government's economic benefit). The Government construes Caremark not having to expend its client's funds to pay for services under a plan as a "benefit" to Caremark.

The Government further argues that when Caremark does not expend its

client's funds, this confers an indirect benefit on Caremark by allowing Caremark to curry favor with the client—and ultimately retain the client's business. Under this analysis, one would have to assume that when Caremark does not reimburse state Medicaid, which results in the Government later reimbursing state Medicaid, the Government has provided "some benefit" to Caremark in exchange for an agreed or expected payment by Caremark to the Government (or for the Government's economic benefit). The Court first observes that the Government has provided no evidence to suggest that Caremark receives such a benefit or "curries favor" with its clients. Even if there is evidence that Caremark retains its clients, there is no evidence that customer retention or acquisition is predicated on this supposed "benefit" to Caremark. Furthermore, the Fifth Circuit has not provided a definition for "benefit" in the context of its analysis in *Bain*. For the Court to extend the definition of "benefit" to a speculative tangential benefit would undermine the plain text of the reverse false claims provision of the FCA and ignore the Supreme Court's recent interpretation that the FCA is punitive in nature and that obligation should be construed narrowly. *Stevens*, 529 U.S. at 784, 120 S.Ct. 1858; *Equifax, Inc.*, 557 F.2d at 460; *Conagra*, 465 F.3d at 1195; *Am. Textile Mfrs. Inst.*, 190 F.3d at 736; *Q Int'l Courier*, 131 F.3d at 773. In sum, this Court will not expand the definition of obligation within the reverse false claims context to include implied or indirect economic relationships between the defendant and the Government.

The Court recognizes that in amending the FCA in 1986, which (among other things) added the reverse false claims provision of Section 3729(a)(7), Congress intended (a)(7) to cover situations where a defendant had contracted with, or leased from, the Government. *See* S.Rep. No. 99–345 at 15, 18 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5284; *see also Bain*, 386 F.3d at 657. Specifically, the Senate Report mentioned *Smith v. United States*, where the Fifth Circuit held that a lessee from the Government, whose lease obligated it to remit quarterly payments and submit quarterly reports *to the Government*, violated the FCA by submitting a report that falsely inflated expenses and thus falsely reduced the amount of rent paid. *See* S.Rep. No. 99–345 at 18 (citing *Smith*, 287 F.2d 299, 303–304 (5th Cir. 1961)); *see also Bain*, 386 F.3d at 657. Thus, in *Smith*, there was a lease between the Beaumont Housing Authority and the Government, creating a direct economic relationship.

The facts of the instant case are distinguishable from *Smith*, at least with regard to Caremark's owing any obligation to the Government when the reimbursement requests were submitted by state Medicaid agencies, because there was no contract or lease between Caremark and the Government. If any economic relationship existed, it was between the third party coverage provider and State Medicaid agencies, or at most, Caremark and the various state Medicaid agencies, but not Caremark and the Government. However, as previously mentioned, this conclusion does not apply to IHS or the VA, where whether Caremark owes an obligation to either agency under (a)(7) remains an open question. The Court is of the opinion that this issue with regard to IHS and the VA has not been sufficiently briefed and will therefore limit its conclusion to a finding that there was no obligation for Caremark to pay the Government when Caremark denied *state Medicaid* requests for reimbursement.

Because the Court grants summary judgment in favor of Caremark with regard to the elements of falsity and obligation, the Government cannot establish

FCA liability with regard to the *pre-Goetz* claims whereby Caremark applied a restriction that existed in the plan in order to deny state Medicaid's request for reimbursement.

## VI. Statute of Limitations

### A. Controlling Date for Statute of Limitations Purposes

Under the FCA, a relator can commence a *qui tam* action by filing a complaint under seal in the Government's name, and alleging violations of the FCA against the Government. 31 U.S.C. § 3730(b). The Government may choose to intervene and proceed with the action. *Id.* § 3730(b)(2). If the Government decides not to intervene, the case can proceed, and the Government may be permitted to intervene at a later date for good cause. *Id.* § 3730(c)(3). In the instant case, the Relator filed the *qui tam* action on August 25, 1999. The Government filed its complaint-in-intervention on August 19, 2005. At dispute between the parties is the date that prompts the running of the statute of limitations under the FCA.

The FCA statute of limitations provision provides:

> (b) A civil action under section 3730 may not be brought—
>> (1) more than 6 years after the date on which the violation of section 3279 is committed, or
>> (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with the responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
> whichever occurs last.

*Id.* § 3731(b). Caremark argues that under the FCA statute of limitations provision, the Government's FCA claims arising six years prior to the date that it filed its unsealed complaint are time-barred. Caremark relies on *United States v. Baylor Univ. Med. Ctr.*, where the Second Circuit held that the critical date for limitations purposes is the date of filing the unsealed complaint. 469 F.3d 263, 268 (2d Cir.2006). Caremark argues that the filing of a *qui tam* action by a relator does not give notice to the party being sued because it is filed under seal. In the event the Government intervenes, Caremark argues that the first time the sued party receives notice is when the Government decides to intervene, file, and serve the unsealed complaint.

In the instant case, the Relator filed her *qui tam* complaint on August 25, 1999, and the seal was not lifted until May 26, 2005. The Government did not file its complaint-in-intervention until August 19, 2005, six years after the *qui tam* complaint was filed. Thus, Caremark asserts that the Government's claims prior to August 19, 1999, are barred by the statute of limitations provision of the FCA.

In contrast, the Government argues that the FCA claims that arose before August 19, 1999 are not barred because: (1) the complaint-in-intervention relates back to the Relator's *qui tam* complaint under Federal Rule of Civil Procedure 15(c)(1); (2) relation back is also possible under Rule 15(c)(2) because Caremark had adequate notice of the Government's claims in early 2000; and (3) the statute of limitations was tolled when the Relator filed her original complaint on August 25, 1999. The Government distinguishes the *Baylor* case by arguing that: (1) the Second Circuit confined its ruling to Rule 15(c)(2) due to the lack of notice to defendant; (2) the court acknowledged relation back under Rule 15(c)(1) could be achieved; and (3) the relator's original complaint in that case

was not sufficient to toll the statute of limitations.

Furthermore, the Government asserts the statutory scheme of the FCA allows the Government to apply for extensions beyond the initial sixty days to conduct its investigation. 31 U.S.C. § 3730(b)(3). The sixty-day extension provision does not limit the number of extensions that the Government may obtain in order to investigate the relator's complaint, provided the Government can establish "good cause" before the court presiding over the case. *Id.* According to the Government, it is illogical to conclude Congress intended to establish a statutory scheme where the Government could investigate claims for which it ultimately would not be entitled to relief if it intervened in the action.

### B. The Core Requirement of Notice

While the Court acknowledges there is case law supporting both of the parties' positions, the Court finds that adopting the Government's argument would belie the intent of the FCA statute of limitations provision and would also contradict the well-settled notice requirements within the Federal Rules of Civil Procedure. As the Second Circuit wrote in *Baylor,* "any relation back of subsequent filings to the original complaint is incompatible to the core requirement of notice . . . ." 469 F.3d at 270. Consequently, the Court finds the Government's FCA claims prior to August 19, 1999, are time-barred.

First, the Court finds the *Baylor* case instructive on this issue and adopts the Second Circuit's holding that the critical date for statute of limitations purposes is the date that the Government files its complaint-in-intervention. 469 F.3d at 268. *Baylor* also involved a *qui tam* action where a relator sued various hospitals under the FCA for allegedly defrauding Medicare. *Id.* at 265. The relator filed his *qui tam* complaint in 1994, but the Government did not file its complaints-in-intervention until 2002 and 2003. *Id.* at 265, 267. During the eight year interim period, the Government made numerous requests to extend the sixty-day period, in which the complaint remained under seal. *Id.* at 266. The Government obtained a partial lifting of the seal and some of the hospitals received limited information about the FCA suits. *Id.*

After the Government filed complaints-in-intervention, the hospitals then moved to dismiss the Government's claims for failure to plead fraud in particularity and for being untimely. *Id.* The district court determined that the Government's complaints satisfied the pleading rules under Rule 9(b) and that they were timely because the controlling date for statute of limitations purposes was the date the original *qui tam* complaint was filed. *Id.* at 267. The hospitals moved for an interlocutory appeal, and the Second Circuit reversed the district court's decision with regard to the statute of limitations issue, and concluded the Government's claims were time-barred because the controlling date was the date on which the complaints-in-intervention were filed. *Id.* at 268.[31]

In contrast to the holding in *Baylor,* the Government cites a Massachusetts district court case, *In re Pharmaceutical Industry Average Wholesale Price Litigation ("In re Pharmaceutical"),* to support its argument that the controlling date in the instant case was when the Relator filed the original *qui tam* complaint. 498 F.Supp.2d 389 (D.Mass.2007). In *In re Pharmaceutical,* the district court held that the critical date for limitations pur-

---

**31.** Because the hospitals made their last false claims in 1995, the six year statute of limitations had expired for all of the Governments claims by 2002, when the complaints-in-intervention were first filed. *Id*

poses is the date the "relator files its sealed complaint against a defendant and otherwise meets the strictures of 31 U.S.C. § 3730(b)." *Id.* at 396. The court emphasized the well-established rule that filing the complaint in a case satisfies the statute of limitations. *Id.; Henderson v. United States,* 517 U.S. 654, 657, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996).

The Court does not disagree with the holding in *In re Pharmaceutical* to the extent it applies to the Relator. Thus, the critical date for statute of limitations purposes *for a relator* is when the relator files a complaint. However, the Court does not interpret this to allow the filing of a relator's complaint to begin the statute of limitations *for the Government.* Furthermore, in response to the *In re Pharmaceutical* court's suggestion that ambiguous statutes of limitation require strict construction in favor of the Government, this Court observes that the cases relied on by the court involve provisions of statutes that allow commencement of an action "at any time," or statutes without limitations clauses at all. *See BP Am. Prod. Co. v. Burton,* 549 U.S. 84, 127 S.Ct. 638, 646, 166 L.Ed.2d 494 (2006); *Badaracco v. Comm'r,* 464 U.S. 386, 391, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984); *Capozzi v. United States,* 980 F.2d 872, 875 (2d Cir.1992). In contrast, the FCA provides a specific statute of limitations provision mandating the later of three or six years, depending on the situation, and there is no question that the limitations period applies to FCA claims such as the Government's claim in the instant case.

Similar to *Baylor* and *In re Pharmaceutical,* the instant case involves an extended time period between the date that Relator filed the original *qui tam* action and the date that the Government filed its complaint-in-intervention. In that interim period of six years, the Government made numerous requests to extend the statutori-

ly prescribed sixty-day period, all of which were granted by this Court. The Government also obtained a partial lifting of the seal, and Caremark was given limited information about the nature of the Relator's claims. The Court adopts the Second Circuit's holding in *Baylor* and finds the statute of limitations period prevents the Government from pursuing claims that occurred prior to six years before it filed the complaint-in-intervention. *Id.* The Court further finds that the Government's complaint-in-intervention does not relate back under Federal Rule of Civil Procedure 15(c)(1) or 15(c)(2).

## C. Relation Back Under Federal Rule of Civil Procedure 15(c) (1)

 Caremark argues relation back under Rule 15(c)(1) is not permitted because there is no specific provision in the FCA that allows relation back, as required by the Rule. Federal Rule of Civil Procedure 15(c)(1) permits relation back of a pleading to an original complaint when "relation back is permitted by the law that provides the statute of limitations applicable to the action." Fed.R.Civ.P. 15(c)(1). While the *Baylor* case held the Government was prevented from relating back to the relator's *qui tam* complaint under Rule 15(c)(2) (discussed below), it did not address the language of Rule 15(c)(1), because the parties did not argue it on appeal. However, the Second Circuit stated "[t]here is a colorable argument that the FCA implicitly 'permit[s]' a form of relation back that dispenses with the requirement of notice" under Rule 15(c)(1). *Baylor,* 469 F.3d at 270. The Court further cited case law suggesting that calculating the limitations period from the date of unsealing, rather than the date the relator filed the action, would be contrary to the "language, structure and purposes of the FCA." *See United States ex rel. Downy v. Corning, Inc.* 118 F.Supp.2d 1160, 1171

(D.N.M.2000); *United States ex rel. Goodstein v. McLaren Reg'l Med. Ctr.*, 97–CV–72992–DT, 2001 U.S. Dist. LEXIS 2917, at *12 (E.D.Mich. Jan. 1, 2002).[32]

The Government takes this very approach and relies on *In re Pharmaceutical* to argue that the "[G]overment's complaint-in-intervention always relates back to the original complaint filed by the relator." *Govt's Resp.* at 13. Specifically, the Government asserts that the FCA contemplates a direct link between the relator and the Government, and the Government's complaint-in-intervention is a modification of the relator's original complaint. *See In re Pharm.*, 498 F.Supp.2d at 398; *United States ex rel Wyke v. Amer. Int'l, Inc.*, No. 01–60109, 2005 WL 1529669, *2 (E.D.Mich. 2005). Furthermore, in response to Caremark's argument that there is no provision in the FCA that allows relation back, the Government argues that the statutory scheme allows the Government to seek sixty-day extensions that could extend the seal beyond the statute of limitations period if the Government's complaint-in-intervention was the operative date. The Government claims it would be "illogical" to assume Congress intended this possibility. *Govt's Resp.* at 14.

The Fifth Circuit has not directly addressed whether a complaint-in-intervention filed by the Government in a *qui tam* action can relate back to the relator's original complaint. While the Court acknowledges the case law to the contrary, the Court disagrees with the Government's argument. Under the plain language of Rule 15(c)(1), relation back is permitted when the applicable statute of limitations

provisions specifically permit it. *See Lovelace v. O'Hara*, 985 F.2d 847, 851 (6th Cir.1993) (holding limitations had run and the applicable statute of limitations contained no specific provision for relation back); *Oros v. Hull & Assoc.*, 217 F.R.D. 401, 404 (N.D.Ohio 2003) (holding that while Ohio law provides for relation back, the statute in question contains no relation back provision and therefore, relation back is not allowed); *Boerger v. Commerce Ins. Servs.*, No. 04–1337, 2005 WL 3235009, *4, 2005 U.S. Dist. LEXIS 30239, at *13 (D.N.J. November 28, 2005). There is no direct relation-back provision in the limitations provision of the FCA; thus, this Court finds Rule 15(c)(1) does not apply here.

Furthermore, the Court does not agree that adopting this view requires an "illogical" assumption that Congress intended this interpretation. In fact, the provisions of the statute support such a reading. In contrast to the Government's argument, the Court finds the allowance of sixty-day extensions, awarded only if made in good faith, suggests Congress believed a short period of time would be sufficient for the Government to conclude an investigation and sought to limit investigations that could continue indefinitely by imposing a requirement for the Government to seek extensions every sixty days. The legislative history to the *qui tam* statute explains that the initial sixty-day period is to allow the Government to fully evaluate the information and determine whether the Government wants to intervene and take over the suit. S.Rep. No. 99–345 (1986), *re-*

---

**32.** The Second Circuit also acknowledged in *Baylor* that if it were to address whether Rule 15(c)(1) permitted relation back, it would be forced to confront the issue of whether the relator s complaint "could serve as a sufficient placeholder to achieve relation back in the *qui tam* context." 469 F.3d at 270. The court opined that if the Government's complaint-in-intervention can relate back to insufficient complaints filed by the relator, the FCA's statute of limitations may fail to serve its purpose. *Id.* In the instant case, the Court need not address this argument because the Relator's complaint in this litigation is not "grossly insufficient" like the relator's complaint in *Baylor*.

*printed in* 1986 U.S.C.C.A.N. 5266, 5289. Congress indicated that "with the vast majority of cases, 60 days is an adequate amount of time to allow Government coordination, review and decision." *Id.* at 5289–90. Furthermore, while the Government may petition for sixty-day extensions, Congress intended "that courts weigh carefully any extensions of the period of time in which the Government has to decide whether to intervene and take over the litigation." *Id.* at 5289. Moreover, the initial rationale for the sixty-day extension under the FCA was so a relator would not unknowingly expose an ongoing criminal investigation. Congress has stated that if the initial stay is granted, "[t]he court should carefully scrutinize any additional government requests for extensions by evaluating the Government's progress with its criminal inquiry. The Government *should not, in any way, be allowed to unnecessarily delay lifting of the seal from the civil complaint or processing of the qui tam litigation.*" *Id.* at 5290 (emphasis added).

The Court cannot conclude, as the Government does, that Congress envisioned investigations lasting for multiple years, in some cases over a decade, and included the sixty-day extension provision in order to create a statutory scheme that would preserve relation back. In fact, under the Government's reading, the statute of limitations provision is essentially eviscerated, because the Government could request sixty-day extensions without end and never face a statute of limitations restriction independent of the relator. No matter how long it chose to delay before appearing in the lawsuit, it would be entitled to relate back to the date the relator filed the complaint. The Court finds this contradicts the plain language of the statute of limitations provision, which contemplates a specific time period before limitations begin to run. Finally, the Court finds that to interpret the FCA's statute of limitations provi-

sion to permit relation back would mean that notice to a defendant in an FCA *qui tam* action would never be required in the relation back context because the Government's complaint-in-intervention in an FCA case could seemingly *always* relate back to the relator's original *qui tam* complaint—even if the defendant never received notice. For the reasons explained below, the Court is reluctant to agree with the Government's position.

## D. Relation Back Under Federal Rule of Civil Procedure 15(c) (2)

Caremark also argues that relation back is not permitted under Rule (c)(2), which states "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2). Caremark argues it did not have actual notice of the claims in this suit until the Government filed the complaint-in-intervention on August 19, 2005. The Government responds that relation back is authorized under Rule 15(c)(2) because the complaint-in-intervention is based on the same scheme and conduct alleged in the Relator's original complaint of which Caremark had notice. The Government argues it informed Caremark of the complaint around March 22, 2000, and numerous meetings and discussions occurred between Caremark, the Relator, and also between counsel.

Again, the Court relies on the Second Circuit's holding in *Baylor* to find that the Government's complaint-in-intervention cannot relate back to the Relator's complaint under Rule 15(c)(2). Despite the Government's contention Caremark had "*actual notice*" of the Relator's complaint and the allegations therein, it is undisput-

ed that Caremark was never served with a copy of the complaint until this case was unsealed in 2005. "The secrecy required by § 3730(b) is incompatible with *Rule 15(c)(2)*, because (as is well-settled) the touchstone for relation back pursuant to *Rule 15(c)(2)* is notice." *Baylor,* 469 F.3d at 270 (emphasis in original); *In re Pharm.,* 498 F.Supp.2d at 398 (stating that notice may be the "lighthouse" of Fed. R.Civ.P. 15(c)(2)); *United States ex rel. Wilkins v. North Amer. Construction Corp.,* No. 14–95–5614, 2001 WL 34109383, *13, 2001 U.S. Dist. LEXIS 20538, at *39 (S.D.Tex. September 25, 2001) (stating "[a]n amended pleading may not relate back to a prior pleading unless the defendant had adequate notice of the amended pleading's claims with the applicable limitations period").

Furthermore, "[t]he fundamental purpose of statutes of limitations is to protect defendants from the prosecution of stale claims and to guarantee that parties are notified when they are being sued". *Id.* (citing *United States v. Kubrick,* 444 U.S. 111, 119, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)). "A complaint filed under seal does not provide notice to a defendant." [33] *Wilkins,* 2001 WL 34109383, *14, 2001 U.S. Dist. LEXIS 20538, at *42. An essential element of civil litigation is notice. The Court is unpersuaded with the Government's argument that Caremark was "aware" of the types of claims against it when Caremark was never actually served the complaint.

Under the Government's analysis, it can conduct investigations lasting for several years before it decides to intervene in a *qui tam* action, all the while the defendant sits without notice during the period that the Government builds its case. Of course the Government can opt to partially unseal the case, so that it can use its subpoena power to subpoena documents and pursue other investigatory methods. But even under that scenario, it is still the fact that the defendant may have limited or no knowledge of the specific claims levied against it. In *qui tam* actions, the Government often delays many years before deciding to intervene, while it investigates and builds its case against the defendant. *See Baylor,* 469 F.3d at 265 (Government delayed eight years before it intervened); *In re Pharm.,* 498 F.Supp.2d at 392 (Government delayed nine years before intervening); *United States ex rel. Shackelford v. Am. Mgmt., Inc.,* 484 F.Supp.2d 669, 672 (E.D.Mich.2007) (Government delayed almost three years before it intervened); *Boeing Co. v. United States,* 75 Fed.Cl. 34, 41(Fed.Cl.2007) (Government delayed four years before it intervened); *United States ex rel. Barmak v. Sutter Corp.,* 95–7637, 2002 WL 987109, *1, 2002 U.S. Dist. LEXIS 8509, at *3 (S.D.N.Y. May 14, 2002) (Government delayed six years before it intervened) *United States ex rel. Lazar v. Worldwide Fin. Servs.,* 01–70414, 2007 WL 4180718, **1–2, 2007 U.S. Dist. LEXIS 86438, at *4 (E.D.Mich. Nov. 26, 2007) (Government delayed over five years before it intervened).

In the instant case, during the six years it took the Government to decide whether or not to intervene, it was able to develop its case using subpoenaed documents and other information from state civil investigative demands, all under the auspicious of potential litigation. Meanwhile, Caremark

---

**33.** The Court observes that in the instant case, the Government partially lifted the seal prior to filing its complaint-in-intervention. However, the decision to partially lift the seal does not allow the Government to circumvent the notice requirements of Rule 15. Informing a party about the *general nature* of existing or potential claims does not provide the same notice as serving that party the complaint, which puts the party on notice of the specific claims he or she must defend.

was stripped of any opportunity to see the potential complaint, avail itself of the court system to answer the charges against it and seek dismissal on the merits. Thus, the Court believes its decision to prohibit relation back in this case is consistent with the notice provision in Rule 15(c)(2). In conclusion and in accordance with *Baylor*, the Court finds relation back under Rule 15(c)(2) is not appropriate because Caremark did not receive notice until the complaint-in-intervention was filed on August 19, 2005.[34]

### E. Purpose of the FCA and its Limitations

In *Baylor*, the Second Circuit cites *United States ex rel. Downy v. Corning, Inc.*, 118 F.Supp.2d 1160, 1171 (D.N.M. 2000), holding that a defendant's argument that limitations applies from the date of unsealing instead of the date the relator filed her action leads to a "conclusion that is contrary to the language, structure and purpose of the FCA." With due regard to the view expressed by the court in *Corning*, this Court believes that its holding here is consistent with the language, structure, and purpose of the FCA. The language of the FCA's limitations provisions makes no statement about relation back to the relator's suit. There certainly is nothing in the structure of the FCA or its limitations provisions that would mandate relation back to the relator's suit. In addition, while the purpose of the statute is to ferret out fraud, it is also punitive rather than remedial in nature. *Stevens*, 529 U.S.

at 784, 120 S.Ct. 1858. Under the circumstances, it is to be strictly construed. To therefore, imply an extended relation back limitations period to the relator's suit would be to give the Act a generous construction rather than a strict one. Thus, the interpretation set forth herein is consistent with the language, structure, and purpose of the FCA. *Equifax, Inc.*, 557 F.2d at 460; *Atkins*, 345 F.Supp.2d at 1304.

### F. Tolling of the Statute of Limitations

The Government argues that independent of the relation back issue, the statute of limitations is tolled when the relator files a complaint. In making this argument, the Government essentially reiterates its arguments above. For the same reasons stated above, the Court finds the filing of the relator's complaint does not toll the statute of limitations for the Government. The Court does not find, as the Government suggests, that it is consistent with the FCA's statutory language to allow the filing of the relator's complaint to toll the statute of limitations with regard to the Government's claims for six years.

For the reasons stated above, the Court finds the controlling date for statute of limitations purposes is August 19, 2005, the date the Government filed the complaint-in-intervention. Furthermore, the complaint-in-intervention does not relate back to the Relator's complaint because (1) there is no statutory language permitting

---

**34.** The Court observes that the seal in this case was lifted on May 26, 2005. Because the cornerstone of the Court's ruling on the statute of limitations issue is notice to Caremark, the Court relied on the date that the Government filed its complaint-in-intervention. The Court was unable to locate in the record any evidence that Caremark received a copy of the Relator's complaint prior to that date. However, if Caremark received a copy of the Rela-

tor's complaint between May 26, 2005 and August 19, 2005, that date would then be the controlling date for limitations purposes in this case because the Court finds the Relator's complaint was a sufficient placeholder for the Government's complaint-in-intervention under the analysis in *Baylor*, 469 F.3d at 270. Because neither party has provided evidence of a different date, the Court finds the controlling date in this case is August 19, 2005.

relation back within the FCA statute of limitations provision, as required by Rule 15(c)(1); and (2) Caremark did not receive sufficient notice under Rule 15(c)(2) until the day the complaint-in-intervention was filed. During oral argument at the January hearing before the Court, the Government argued that the statute of limitations issue should be looked at on a case-by-case basis. The Court acknowledged that, in this case, Caremark did not have notice and the Government's delay—while allowing it to build its case for six years—was not permissible. Consequently, the Government's FCA claims in this case are limited to claims from August 19, 2000 forward. Therefore, the Court grants summary judgment to Caremark on this issue.

## VII. Recoupment

■ The federal common law claim of recoupment allows the Government to recover funds that its agents have wrongfully, erroneously, or illegally paid. *United States v. Wurts*, 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932 (1938). Caremark and the Government have cross-moved for summary judgment on the Government's common law recoupment claim. For the reasons stated below, the Court grants summary judgment in favor of Caremark on this issue and denies summary judgment for the Government.

Caremark argues the Government's recoupment claim is misplaced because the Government made payments to the individual states in order to partially fund state-run Medicaid programs. Caremark also explains that with regard to the VA and IHS, the Government made payments to pharmacies and not to Caremark. Therefore, Caremark asserts there is nothing to recoup.

The Government responds that it can recover funds because Medicaid is considered to be the payor of last resort, and Medicaid is federally funded in part.

*Caremark, Inc. v. Goetz*, 480 F.3d 779, 783 (6th Cir.2007); *see also* Medicaid Programs; State Plan Requirements and Other Provisions Relating to State Third Party Liability Programs, 55 Fed.Reg. 1423, 1423–24 (1990). Furthermore, the Government argues that under common law, it has a right to be whole. Therefore the Government asserts Caremark is required to reimburse the Government.

■ The Court finds the Government is not entitled to recoupment from Caremark because there are no assignment rights to the Government under the Medicaid statutes and no payments by the Government were made to, or flowed into the hands of, Caremark. First, although the Government relies on the Medicaid statute to claim a recoupment right, the Medicaid assignment statutes provide that Medicaid beneficiaries shall *"assign* to the State any rights, of the individual ... to payment from medical care from any third party." 42 U.S.C. § 1396k(a)(*l*)(A) (emphasis added). As the Court points out above, because states, and not the Government, are assigned rights to payment from third parties in the Medicaid context, the Government cannot seek reimbursement from Caremark. The Government partially funds state Medicaid programs by making payments to the states, and not to third parties such as Caremark; therefore, if any recoupment right exists, it must be against the states themselves.

But the Government's recoupment claim fails for a more fundamental reason— Caremark did not receive any payments that the Government could recoup. Likewise the individual states' recoupment claims, as well as the Government's recoupment claims on behalf of the VA and IHS, also fail for this reason. The individual state Medicaid agencies, along with the VA and IHS, make payments to pharmacies or pharmaceutical manufacturers.

Because no payments are made to Caremark, there is nothing for the states, or the VA and IHS, to recoup from Caremark. Common law recoupment is the wrong vehicle to seek statutory reimbursement in this case.

The Government suggests that recoupment is a possible cause of action "to obtain repayment from a third party into whose hands the mistaken payments flowed where the third party participated in and benefited from the tainted transaction." *LTV Educ. Sys., Inc. v. T.H. Bell,* 862 F.2d 1168, 1175 (5th Cir.1989). In *LTV,* the defendant was held liable for the amount of loans erroneously paid to students, where those loans were then paid to the defendant in the form of tuition. *Id.* at 1175. Therefore, the defendant in *LTV directly benefited by receiving payments* in the form of tuition. This case is distinguishable from the instant case because there is no evidence Caremark received payments made by the Government or a state Medicaid agency—either directly or indirectly.

Similarly, the Government cites *United States v. Mead* for the proposition that it has a right of recovery even though funds were not directly paid to Caremark.[35] 426 F.2d 118 (9th Cir.1970). Again, this case is distinguishable from the instant case. The *Mead* case involved *mistaken payments made by the federal government to Mead* under a federal conservation program. *Id.* at 120 (emphasis added). The court found Mead was liable to the government for each of the mistaken payments because Mead, unlike Caremark, was the active force in obtaining the payments and directly received the benefits of the pay-

ments. There is no evidence that Caremark directly received the benefits of any payments made by the Government.

Furthermore, the Government's argument that the right to recover the federal share of Medicaid payments is "directly analogous to the Government's rights in the Medicare context," is unpersuasive. *Govt's Resp.* at 8. The Government cites *Provident Life & Accident Ins., Co. v. United States,* which held that the Government had an implied right of action under the *Medicare* Secondary Payor laws that was independent of statutory rights. 740 F.Supp. 492, 506 (E.D.Tenn.1990) (emphasis added). However, as the Government points out, in the case of *Medicare,* the Government makes payments directly to providers for providing healthcare products and services to Medicare beneficiaries, but with *Medicaid,* the Government makes payments to the states. *Govt's Resp.* at 9 (emphasis added). In the case of Medicare, recoupment is an appropriate remedy when the Government seeks to recover an erroneous payment it made to a healthcare provider. In contrast, the Government pays the states to partially fund state Medicaid agencies. Thus, the recoupment right allows the Government to recoup from the state. Therefore, the Government incorrectly argues that its right to recover payments under Medicaid is "directly analogous" to its right under Medicare.[36]

Finally, the "catch all" claim that the Government has a right to be made whole does not give the Government a valid recoupment claim against Caremark. While the Court agrees that the case law provided by the Government stands for the prop-

---

**35.** The Court observes that both *Mead* and *LTV* involve "payment by mistake" claims instead of recoupment claims.

**36.** The Government also cites *Mount Sinai Hosp., Inc. v. Weinberger,* which is also distin-

guishable from the instant case under this analysis because it involves Medicare, rather than Medicaid. 517 F.2d 329, 337 (5th Cir. 1975).

osition that the Government has a common law right to recover funds "wrongfully, erroneously, or illegally paid," such a right does not allow the Government to recover funds from third parties who did not benefit by receiving such payments. *See LTV,* 862 F.2d at 1175; *Wurts,* 303 U.S. at 415, 58 S.Ct. 637; *Mead* 426 F.2d at 124. The Government even concedes that the third party coverage provider receives the benefit of avoiding its payment obligation for dual eligibles. *Gov't's Resp.* at 10 (emphasis added). The Government has provided no case law to support the argument that it has a right to recoup from Caremark, even though a third party, and not Caremark, received the benefit from the mistaken payments. The fatal flaw in the Government's argument is that Caremark never received the funds that the Government's agents "wrongfully, erroneously, or illegally paid." *See Wurts,* 303 U.S. at 415, 58 S.Ct. 637. Consequently, the Government's recoupment claim must fail and Caremark is therefore entitled to summary judgment on this issue.

## VIII. Caremark's Examples of Allegedly False Claims

In its Motion for Partial Summary Judgment, Caremark moves for summary judgment on the Government's two examples of allegedly false statements made by Caremark. The first example involves a timely filing denial letter that Caremark sent to IHS in response to a request for reimbursement. The second examples involves an out-of-network denial letter that Caremark sent to Oklahoma Medicaid in response to a request for reimbursement.

### A. IHS Example: Timely Filing Restriction

 Caremark moves for summary judgment on one of the Government's specific claims involving IHS. The federal statute that authorizes IHS to submit requests for reimbursement to private health plans gives the Government the "right to recover the reasonable expenses incurred by [it] in providing health services ... to any individual to the same extent that such individual ... would be eligible to receive reimbursement." 25 U.S.C. § 1621e(a). Thus, IHS requests for reimbursement are processed in the same manner as individual plan participant requests. As such, Caremark was required to reimburse IHS "to the same extent that such individual ... would be eligible to receive reimbursement." 25 U.S.C. § 1621a(a).

Caremark provides evidence that a timely filing restriction was correctly applied to deny IHS's reimbursement request. Specifically, Caremark argues that a July 29, 1997 denial of a reimbursement request submitted to IHS based on a timely filing restriction is a true statement because IHS did not submit its request for reimbursement within the plan's timely filing limit of one calendar year plus ninety days. *Caremark's Mot. for Partial Summ. J.* at 15–16.

In response, the Government claims that IHS was entitled to recover the amount the plan would have paid had IHS not been paid, regardless of procedural restrictions that would apply against the plan participant if he did not file a claim within the time frame specified in the plan. However, the Government does not come forward with specific facts showing that there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505 (1986); *TIG Ins.,* 276 F.3d at 759 ("Once the moving party has initially shown 'that there is an absence of evidence to support the non-moving party's cause,' the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." (quoting *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548)). Instead, the Government argues that Caremark has failed to provide competent summary judgment evidence to

prove whether a restriction was correctly or truthfully applied. In particular, the Government complains that the 30(b)(6) witness's affidavit and computer records are inadmissible or insufficient.

Courts have held the documentary evidence is competent summary judgment evidence if it is authenticated by a Rule 56(e) affidavit of a person through which the exhibits could be admitted into evidence. *Perez v. Alcoa Fujikura, Ltd.,* 969 F.Supp. 991, 997–99 (W.D.Tex.1997); *Helen of Troy, L.P., v. Zotos Corp.,* 235 F.R.D. 634, 639 (W.D.Tex.2006); *see also Love v. Nat'l Med. Enters.,* 230 F.3d 765, 776 (5th Cir. 2000) (stating that the affidavit of a "witness with requisite knowledge to testify that the attachment was what it was claimed to be" sufficiently authenticates documentary evidence). The Government does not provide a legal basis for its assertions, failing to cite case law or federal rules as to why Caremark's documentary evidence is not competent summary judgment evidence.

In the present case, Caremark provided the affidavit of Ms. Brinati (Vice President of Client Benefit Operations for CVS Corp.), who stated that the records were true and correct copies of her research on this issue, and that the computer screen shots were what they was claimed to be. *See B. Brinati Aff.* at 4. The computer records offered are admissible as business records pursuant to Fed.R.Evid. 803(6). *See United States v. Sanders,* 749 F.2d 195, 197–99 (5th Cir.1984) (finding computers records admissible under Fed.R.Evid. 803(6)). Accordingly, the affidavit and computer record submitted by Caremark is competent summary judgment evidence.

In addition, the Government argues that the evidence does not contain the date that the IHS submitted the request to Caremark or the date that Caremark received it. The Government explains that if a timely filing restriction can be properly imposed, it is based on the date that a claim was *submitted* to Caremark. Thus, the Government contends that Caremark's evidence does not establish that IHS failed to submit the reimbursement request within the timely filing period. However, Exhibit 5 to Caremark's summary judgment motion shows that the prescription had a fill date of December 30, 1996 and a received date of July 21, 1997. Thus, the claim was received outside of the timely filing period. The Government does not offer any evidence to rebut Caremark's contention. Significantly, the Government does not provide any evidence to suggest that IHS submitted the claim within the timely filing period. The Court recognizes that IHS is a federal agency and that this claim is integral to the Government's allegations of FCA violations against Caremark. The Government must provide some evidence in support of its suggestion that IHS submitted the claim within the timely filing period in order to overcome summary judgment on this example. It has failed to do so.

Based on the evidentiary record before the Court, when Caremark informed IHS that the request was not submitted within the time limit of calendar year plus ninety days, it was a true statement.[37] *See Unit-*

---

**37.** The issue in *Goetz* did not involve IHS or the VA. Only the applicability of restrictions to state Medicaid agencies was before the court. The extent that specific restrictions apply to IHS was not briefed. Nevertheless, the Court assumes that card presentation/paper claims and timely filing restrictions applied to IHS would succumb to a similar analysis and conclusion as reached in *Goetz.*

Unlike with state Medicaid, PBMs like Caremark did not receive clarification regarding IHS or the VA from the *Goetz* decision in 2005. Consistent with the Court's decision above, the Court concludes that even if the restrictions cannot apply to IHS or the VA, when Caremark notified these agencies that a reimbursement request was denied based on a restriction in the corresponding plan, this

*ed States ex rel. Roby v. Boeing Co.,* 100 F.Supp.2d 619, 625 (S.D.Ohio 2000); *United States ex rel. Milam v. Regents of Univ. of California,* 912 F.Supp. 868, 883 (D.Md.1995) ("False Claims Act liability cannot be imposed on the basis of a literally true statement."). Accordingly, Caremark has provided competent summary judgment evidence establishing that it is entitled to summary judgment on the Government's IHS claim.

### B. Oklahoma Medicaid Example: Out-of-Network Restriction

As previously mentioned, one of the restrictions at issue in this case is the out-of-network restriction. The Court concludes that this restriction is substantive as it affects the type or quantum of coverage under a plan, instead of the mode or manner of reimbursement. Limiting the pharmacies at which a plan participant can fill prescriptions is a substantive aspect of the plan. Specifying that a plan participant, regardless of eligibility for Medicaid, may only fill his or her prescriptions in certain pharmacies has nothing to do with the manner or mode of seeking reimbursement. The Government argues this restriction is procedural because it could never comply with it. However, under the Government's view, Medicaid could never comply with any of the restrictions because it is the plan participant who must choose, in a sense, whether or not to comply with the restrictions in the plan.

The relevant inquiry is whether the health plan's medical coverage is based on the sole ground that an individual is a Medicaid recipient. Medicaid must get the same rights as the plan participant, and the restriction cannot discriminate by giving the Medicaid less than what the plan participant is entitled to at the point of sale. The Government's position on this issue would virtually render all restrictions meaningless. Furthermore, the law surrounding the application of an out-of-network restriction to deny a Medicaid request is unclear, as evidenced by the Government's inconsistent positions as to this restriction.

Before the district court in *Goetz,* the United States and Tennessee both conceded that network restrictions *do* apply to Medicaid reimbursement requests. *Goetz,* 395 F.Supp.2d at 693. Tennessee agreed that "TennCare's reimbursement is limited to the coverage applicable to the plan participant at the point of sale." *Id.* However, when questioned at oral argument by the Sixth Circuit panel, both the United States and Tennessee backtracked from their concessions. Instead of unequivocally taking the position that network restrictions do not apply to Medicaid reimbursement requests (which is the position the Government now takes), both Tennessee and the United States admitted they had yet to take a position on the issue. The United States stated it had "not taken a clear position on this" because it was "still considering [this] particular issue . . . ." *Caremark's Mot. for Summ. J.,* Ex. 9 at 12–13.[38]

did not constitute FCA liability. However, a question remains regarding timely filing and card presentation/paper claims restrictions applied to IHS or the VA in the aftermath of *Goetz.*

**38.** The Government argued before the Sixth Circuit that the district court "understood the United States position to have been the same as TennCare's" but "[t]hat was actually not the case; the United States has not taken a clear position on this." However, in its

briefing to the distort court, the Government stated "[e]ven if a Medicaid beneficiary does not use a Caremark pharmacy because she is unaware of Caremark coverage or finds it convenient to go elsewhere in such a circumstance Caremark would be required to reimburse Medicaid the amount due had the drug been obtained from an out-of-network pharmacy." 395 F.Supp.2d 683, 693 (citing *Mem. In Support Of United States' Mot. For*

Furthermore, when Tennessee was questioned about its concession that network restrictions *apply,* it stated "I think we were wrong on that." *Id.* at 9. It further stated "this is a complicated area, we conceded it in the District Court, and not before this court, I don't think this concession will necessarily apply." *Id.*

Understandably, one's analysis of how the broadly interpreted "payor of last resort" language applies in specific assignment situations can evolve and an agency is not mandated to make a decision with absolute finality. However, to then later seek punitive damages and argue that the law has always been clear is troubling. It appears the Government is arguing that the law was clear that *no* restrictions apply to state Medicaid (including network restrictions), regardless of the fact that the United States and Tennessee examined the issue in 2004 only to determine that network restrictions *did* apply to state Medicaid, despite in 2006 concluding that the restrictions *may or may not* apply when before the Sixth Circuit, and now in 2007 determining it *could never* have applied. Thus, the Government appears to be arguing that the law was clear to Caremark, even though it appears it was not clear to the Government.

In *Goetz,* the District Court explained that Tennessee indicated that it "agrees to this limitation [that network restrictions apply] based on the opinion of the Centers for Medicare and Medicaid Services set forth in a letter dated January 19, 2005." *Goetz,* 395 F.Supp.2d at 693 n. 3. After Tennessee and the Government conceded that network restrictions apply to state Medicaid, the district court stated that it was unnecessary to opine on this issue. *Id.* at 693. However, the court noted that if it used its same analysis regarding card presentment and timely filing, it would reach the same conclusion as the parties,

which was that network restrictions applied to TennCare. *Id.* at n. 4.

The Government argues that federal and state regulations establish that Medicaid is the payor of last resort, and those regulations are not new. *Gov.'s Resp.* at 26. Furthermore, it argues that the decision in *Goetz* did not create new law, but rather *acknowledged* the meaning of these long-standing statutes. *Id.* The Government contends that the broad assertion that because Medicaid is deemed to be the payor of last resort, Caremark is required to pay for coverage that its client does not authorize. Again, despite the Government's inconsistent positions on this issue, it argues that Caremark should have been able to understand that network restrictions could not apply to Medicaid.

### 1) June 7, 2006 EOP

Turning to Caremark's example, the Government alleges that the statement in a June 7, 2006 EOP to Oklahoma Medicaid explaining "OUT OF NETWORK–NO REIMBURSEMENT ISSUED" is false. However, the facts show that this is a true statement and the prescription at issue was filled at a pharmacy outside of the plan's network. *Caremark's Mot. for Partial Summ. J.,* Exs. 7,8. The Court finds Caremark's statement was not false under the FCA with regard to this example.

The Government does not show through actual evidence that the statement is false and that the prescription was filled at an in-network pharmacy. The Government has not met its burden on this example. On the other hand, Caremark has shown through competent summary judgment evidence that this statement is actually true. For the reasons stated above, because this statement is true and based on an existing restriction in a corresponding plan, and

*Summ. J. Or, In The Alternative, to Dis. Or* *Transfer,* at 22).

because the law has been unclear on whether out-of-network restrictions apply in the Medicaid context, the Court denies summary judgment for the Government and grants summary judgment for Caremark.

## IX. The Government's Examples of Allegedly False Claims

In its Motion for Partial Summary Judgment, the Government moves for summary judgment on several examples of allegedly false statements made by Caremark. The Court addresses these examples below.

### A. The Government's Paper Claims Examples

As stated above, some of the health plans designed by Caremark's clients allow plan participants to pay in cash at the point of sale and then submit a "paper claim" for reimbursement at a later point (after-the-fact), instead of requiring them to present their Caremark card at the point of sale. This is commonly referred to as a "paper claims" benefit. When a reimbursement is not processed through the pharmacy's computer at the counter, but sent to Caremark after-the-fact, Caremark must manually input the request. Sometimes clients decide they do not want plan participants to submit after-the-fact reimbursement requests. In many instances "paper claims" for reimbursement are either not allowed or the reimbursement amount to the plan participant is decreased. This is often referred to as a "paper claims" restriction, or a card presentation requirement (where the plan participants must present their Caremark cards or otherwise identify themselves as plan participants at the pharmacy counter). Therefore, an after-the-fact reimbursement is not the same as a claim sent through the pharmacy's (in store) computer system. The difference is not so much an "electronic" versus "paper" distinction as it is whether the claim is processed via the pharmacy's computer at the point of sale or submitted after-the-fact, and therefore not via the pharmacy's computer.

For reimbursement requests denied by Caremark before the *Goetz* decision in 2005 that were based on an existing "paper claims" restriction in a corresponding plan, the Government cannot establish the element of falsity for FCA liability for the reasons stated above. That is, to the extent the allegation is not that Caremark lied and the plan at issue actually allowed for the processing of paper claims, the Government's examples of paper claims that occurred before *Goetz* fail.

In many instances, the Government simply states that Caremark's decision to apply plan restrictions is false because it characterizes a state Medicaid reimbursement request as a paper claim submitted by a plan participant. *Govt's Mot. for Partial Summ. J.* at 19. That is, the Government argues that state Medicaid should not be treated the same as the plan participant. In making this statement, Caremark was assigning state Medicaid the plan participant's right to reimbursement in accordance with the governing statutes.

The Government can cite no law prior to *Goetz* that requires a PBM to honor an after-the-fact reimbursement request when the third party coverage provider has not authorized such a provision in the plan. It was not until January 2005, that CMS issued a fact sheet that articulated the position that paper claim restrictions do not apply to state Medicaid requests for reimbursement. Caremark argues that the CMS Fact Sheet did not suggest that Caremark was required to process claims on behalf of a plan that had not hired it to do so. In fact, CMS acknowledged that Caremark has no authority or ability to do so unless and until it receives authorization from its client.

The Government further argues that Caremark impermissibly treated Medicaid requests for reimbursement as paper claims when they were not paper claims but simply requests for reimbursement. This is on its face a distinction without a difference. Any after-the-fact reimbursement is simply referred to as a "paper claim." After-the-fact requests for reimbursement are synonymous with after-the-fact paper claims for reimbursement.

The Government moves for the Court to hold that certain examples of Caremark's notifications to state Medicaid are false statements as a matter of law. In response, Caremark filed a cross-motion for summary judgment on the very same examples. The Court will now discusses the Government's five "no paper claims" examples.

### 1) February 24, 2005 Rejection Letter to Texas Medicaid

The Government claims that a February 24, 2005 rejection letter to Texas Medicaid stating that "the participant's prescription benefit plan does not have a paper claims provision that would allow Caremark to process any claims" is a false statement. However, the Government's evidence shows that the plan at issue did not provide a paper claim benefit, and instead only provided a mail order or point of sale benefit. *See Sealed Appendix to the Gov't's Mot. for Partial Summ. J.,* Ex. E. at CK20002769. The Court finds Caremark's statement was not false under the FCA with regard to this example.

Furthermore, the Government does not establish that Caremark's statement to Texas Medicaid is a legally false statement

because at the time the statement was made in February 2005, there was no law that clearly required a PBM such as Caremark to process a paper claims request on behalf of a plan that did not have a paper claims benefit. Federal law was relatively silent on this issue until January 2005 when CMS issued a fact sheet for the first time articulating that paper claims do not apply to state Medicaid requests for reimbursement. However, the CMS Fact Sheet did not suggest that PBMs such as Caremark could process claims outside of its contractual parameters. Instead, it acknowledged that Caremark had no authority or ability to process claims on behalf of a plan until it received authorization from its client. The CMS fact sheet appears to be directed at the third party coverage providers rather than PBMs such as Caremark. Thus, the law was unclear and the Court will not grant FCA liability to the Government on this example, and instead grants summary judgment in favor of Caremark.[39]

### 2) November 4, 2004 Rejection Letter to Illinois Medicaid

The Government claims that a November 4, 2004 rejection letter to Texas Medicaid stating that "the participant's prescription benefit plan does not have a paper claims provision that would allow Caremark to process any claims" is a false statement. However, the evidence submitted by the Government shows that this is in fact a true statement. The plan at issue, sponsored by Mail Handlers Benefit Plan, did not provide a paper claim benefit, and instead only provided mail order benefits. *See Sealed Appendix to the Gov't's*

---

**39.** Although the Court concludes that FCA liability does not apply because the element of falsity has not been proven and Caremark is released of FCA liability on pre-*Goetz* denials, statutory reimbursement may still be an issue. The Court only addresses whether Caremark

is subject to FCA liability with regard to this example. Whether Caremark or its client, the third party coverage provider, ultimately owes statutory reimbursement to Texas Medicaid remains an open question.

*Mot. for Partial Summ. J.,* Ex. F at CK20001938. At the time the statement was made in November 2004, there was no law that clearly required a PBM to process a paper claims request on behalf of a plan that did not have a paper claims benefit or a point of sale benefit. Thus, the Government's motion for summary judgment on this example is denied and Caremark's motion is granted.

### 3) October 11, 2006 Rejection Letter to New Jersey Medicaid

The Government claims that a October 11, 2006 rejection letter to New Jersey Medicaid stating that "we are unable to process the enclosed prescription drug claim because Caremark no longer processes paper claims for your prescription benefit plan" is a false statement. The plan at issue, sponsored by Horizon Medicare Part D Plan, did not provide a paper claim benefit, and instead only provided mail order benefits. *See Sealed Appendix to the Govt's Mot. for Partial Summ. J.,* Ex. G at CK20001949. There is no after-the-fact reimbursement (paper claim) allowed because the plan participant is only allowed to receive prescriptions via mail. While Caremark's denial of the request did not succinctly state that the plan only allowed prescriptions to be filled via the mail, Caremark offers evidence to support its assertion that the plan did not contain an after-the-fact (paper claims) benefit.

The question at issue with this example may be one that was not adequately addressed in *Goetz* or by the DRA. That is, in the after-math of *Goetz* and the DRA, is Caremark required to process reimbursement requests when the claim is for a prescription that was filled "in-store" and the corresponding plan at issue does not provide such a benefit? If state Medicaid is assigned the rights of the plan participant, and the plan participant only has the right under a plan to fill prescriptions via mail order, it would likely follow that state

Medicaid only has those very same rights. At first blush, such a restriction appears to be a substantive restriction on the type of coverage a plan contains, instead of a procedural restriction on the mode or manner one seeks reimbursement. Nevertheless, the particulars of this situation have not been briefed and the Court will refrain from entering a ruling on this type of restriction at this time. Accordingly, both the Government and Caremark's Motions for Summary Judgment are denied as to this example.

### 4) November 10, 2006 Rejection Letter to Indiana Medicaid

The Government claims that a November 10, 2006 rejection letter to Indiana Medicaid stating that "we are unable to process the enclosed prescription drug claim because Caremark no longer processes paper claims for your prescription benefit plan" is a false statement. In its Reply brief, the Government withdraws it request for summary judgment on this example in light of Caremark's evidence, which establishes that Alcoa Building Products terminated its contract with Caremark effective January 1, 2003. Accordingly, Caremark's Motion is granted as to this example and the Government's Motion is denied as moot.

### 5) Letter to the VA

The Government claims that Caremark sent a letter to the VA stating that the plan at issue did not have a paper claims benefit. However, the Government does not provide any evidence that Caremark sent a statement to the VA. Because there is an absence of proof, the Government's motion for summary judgment on this example is denied and Caremark's motion is granted. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. The Government's Preauthorization Example

The Government claims that Caremark's statement to Massachusetts Medicaid explaining "preauthorizations required" is a false statement. *App. to Govt's Mot for Summ. J.,* Ex. R. Caremark has also moved for summary judgment on this example against the Relator and established that the plan at issue did in fact have a preauthorization requirement for migraine medications. A preauthorization requirement is a substantive restriction as it affects the type or quantum of coverage under a plan, instead of the mode or manner of reimbursement. Limiting the ability of a plan participant to get a particular prescription filled and covered under the plan by requiring that the plan participant first receive preauthorization is a substantive aspect of the plan.

The Government argues that preauthorization restrictions effectively act to deny pharmaceutical coverage on the ground that the plan participant is a recipient of federal health care benefits. However, specifying that a plan participant, regardless of eligibility for Medicaid, may only fill certain prescriptions after receiving "authorization" has nothing to do with the manner or mode of seeking reimbursement. The Government further argues that this restriction is procedural because it could never comply with it. The Court has already addressed this argument and reiterates that under the Government's view, Medicaid could never comply with any of the restrictions.

The relevant inquiry is whether the health plan denies coverage on the sole ground that an individual is a Medicaid recipient. Medicaid must get the same rights as the plan participant and the restriction cannot discriminate by giving Medicaid less than what the plan participant is entitled to at the point of sale. The Court finds that the preauthorization restriction is a substantive aspect of a health plan. Furthermore, the law surrounding the application of a preauthorization restriction to deny a Medicaid request is unclear. Accordingly, the Government's Motion is denied as to this example and Caremark's Motion is granted.

## C. The Government's Timely Filing Examples

### 1) March 19, 2005 statement to Illinois Medicaid

The Government claims that a March 19, 2005 statement to Illinois Medicaid explaining that the "claim submitted after filing limit date" is a false statement. *App. to Govt's Mot for Summ. J.,* Ex. K. The Government provides evidence that the Plan Design Report for the State of Illinois Employees Plan that shows the plan had a "claims stale date of Plan year plus 365." *Id.* at CK20001912. However, the Government does not provide evidence to show that Illinois Medicaid submitted its claim (for its own state plan) within the timely filing period. Accordingly, there is not enough summary judgment evidence to warrant summary judgment for the Government. There is an absence of proof showing that the statement above is false. In its Reply, the Government argues that Caremark was obligated to pay Illinois Medicaid regardless of timely filing restrictions.

However, on the date the statement was made, the law was unclear as to whether timely filing restrictions could be applied to Medicaid. Accordingly, FCA liability is not appropriate and for the reasons stated above, the Government's motion for summary judgment on this claim is denied, and Caremark's motion is granted. The extent to which *Goetz* and the DRA warrant stat-

utory reimbursement on this example is an open question.

### 2) November 16, 2004 statement to Delaware Medicaid

The Government claims that a November 16, 2004 statement to Delaware Medicaid explaining "claim submitted after filing date" is a false statement. *App. to Govt's Mot for Summ. J.*, Ex. M. The Government contends that the plan at issue contained no timely filing period. However, the Government appears to have submitted the wrong plan in support of its Motion. Under the correct plan, the there is in fact a timely filing limit of 186 days. The Government contends that its inadvertent error in submitting the wrong plan in support of its Motion is primarily the result of Caremark failing to produce the correct plan.

The Government now agrees that there was a timely filing restriction. However, it contends that the request for reimbursement was submitted prior to the timely filing deadline. The Court is unable to determine if the reimbursement request was filed within the timely filing deadline. Accordingly, the Government's Motion is denied as to this example and Caremark's Motion is also denied. If it turns out that the request was filed after the timely filing deadline there would be no false claims liability for the reasons stated above.

### D. The Government's Out–of–Network Examples

### 1) January 1, 2007 statement to Massachusetts Medicaid

The Government claims that a January 1, 2007 statement to Massachusetts Medicaid explaining "out-of network pharmacy, no reimbursement issued" is a false statement. *App. to Govt's Mot for Summ. J.*,

Ex. O. The Government provides evidence in the form of a plan design report that states "Out of Network pharmacy claims are not covered." *Id.* at CK20001788. This means there is a substantive restriction in the plan and the plan participant will not be reimbursed if she fills a prescription at an out-of-network pharmacy. A plan participant's status as a dual eligible does not automatically change this substantive coverage and make out-of-network pharmacies a permissible part of the plan.

The Government does not provide evidence that the prescription at issue was actually filled at a pharmacy in the plan's network. Accordingly, there is an absence of proof to show that this statement is false. As stated above, the law on this issue was unclear. For the reasons stated above, the Government's Motion for Summary Judgment on this example is denied and Caremark's motion is granted.

The Government does not provide evidence that the prescription at issue was actually filled at a pharmacy in the plan's network. Accordingly, there is an absence of proof to show that this statement is false. As stated above, the law on this issue was unclear. For the reasons stated above, the Government's Motion for Summary Judgment on this example is denied and Caremark's motion is granted.

### 2) August 19, 2006 statement to Florida Medicaid

The Government claims that an August 19, 2006 statement to Florida Medicaid explaining "Out of Network pharmacy, no reimbursement issued" is a false statement. *App. to Govt's Mot for Summ. J.*, Ex. 5.[40] The Government cites Plan Design Data that states "In–Network pharmacy claims will be reimbursed based on phar-

---

**40.** It is important to note that the Government purports to represent the state of Florida, despite the state voluntarily withdrawing

from the case and not pursuing litigation against Caremark.

macy pricing. Out of Network pharmacy claims will be reimbursed based on pharmacy pricing." *Id.* at CK20002057. However, it appears from the plan that the out-of-network pricing provision did not take affect until July 21, 1999. The prescriptions at issue were filled in 1998. *Id.* at DOJ000295. Caremark contends that from the period of January 1, 1995 to July 20, 1999 (during the time in which the prescriptions at issue were filled), the plan contained a network restriction that only allowed for reimbursement of claims that were filled in-network.

The Government provides no evidence to support its claim that this prescription was filled in-network. Accordingly, the Government fails to support its claim and summary judgment is denied. Additionally, the Court is unable to determine whether the network restriction actually existed at the time the prescriptions were filled. There is a fact issue regarding this claim and therefore, Caremark's Motion is denied as to this example. If the network restriction actually existed as Caremark purports, then the Government's claim will fail because the statement was true and the law was unclear regarding this example.

### 3) Out–of–Network statements for the VA and IHS

The Government moves for summary judgment on two examples of alleged false claims purportedly submitted to the VA and IHS. *App. to Govt's Mot for Summ. J.,* Ex. P, Q. After careful review and consideration, the Court finds that the format in which these examples are submitted is not clearly cognizable. Accordingly, the Court is unable to make a ruling at this time. Thus, both motions are denied on these examples.

### X. Conclusion

For the foregoing reasons, the Court makes the following rulings: (1) the Court denies summary judgment for Caremark on the issue of whether the alleged false claims at issue in this litigation must. be presented to the Government; (2) the Court grants summary judgment in favor of Caremark and denies summary judgment for the Government with respect to the "falsity" element of reverse FCA claims based on Caremark applying restrictions that existed in the corresponding plan on pre-*Goetz* denials; (3) the Court grants summary judgment in favor of Caremark and denies summary judgment for the Government with regard to the "obligation" element of the FCA for Caremark's denials of reimbursement requests made to state Medicaid agencies; (4) the Court grants summary judgment in favor of Caremark that the FCA's statute of limitations provision prohibits the Government's FCA claims prior to August 19, 1999; (5) the Court grants summary judgment in favor of Caremark and denies summary judgment for the Government on the issue of common law recoupment; (6) the Court both grants and denies summary judgment for Caremark, and denies summary judgment for the Government, with respect to the examples of alleged false claims listed below; and (7) the Court grants summary judgment in favor of Caremark and denies summary judgment for the Government with regard to alleged false claims that are based on out-of-network or preauthorization restrictions, as the Court finds that such restrictions are substantive.

This ruling means that the plaintiffs in this litigation are precluded from arguing that Caremark is subject to FCA liability under 31 U.S.C. § 3729(a)(7) for denial of reimbursement requests based on a restriction that existed in the corresponding plan, whether substantive or procedural, if the denial occurred before the initial holding in the *Goetz* case. This does not preclude the plaintiffs from arguing that the various Medicaid agencies are entitled to

statutory reimbursement, an issue that has not been briefed at this point in time. The holding also precludes the plaintiffs from alleging that Caremark's denials of reimbursement requests based on preauthorization or out-of-network restrictions are false under the reverse false claims provision of the FCA, both before *Goetz* and after, because the Court has determined that such restrictions are substantive and therefore, do not discriminate against Medicaid.

Accordingly, Caremark's Motion for Partial Summary Judgment (Docket No. 318) is GRANTED IN PART and DENIED IN PART.

Furthermore, the Government's Motion for Partial Summary Judgment (Docket No. 344) is DENIED.

It is so ORDERED.